Rockingham, Feb. 6, 1940. } No. 3085.

TRUSTEES OF PHILLIPS EXETER ACADEMY *v.* EXETER.

474

*Demond, Sulloway, Piper & Jones* (*Mr. Piper* orally), for the plaintiff.

*Richard F. Upton, Batchelder & Wheeler* and *Robert W. Upton* (*Mr. Robert W. Upton* orally), for the defendant.

ALLEN, C. J. 1. By the 1913 enactment (Laws 1913, *c.* 115) the legislature intended to repeal in its entirety the tax-exemption clause of the plaintiff's charter, so far as it had constitutional power to do so and so far as it had not already been repealed by earlier enactment (Rev. St., *c.* 39, *s.* 2). An intent not to act in excess of power is to be found, but within the due exercise of powers, the design that the 1913 act should extend to all "institutions devoted to educational purposes, . . . incorporated within this state" (*Ib., s.* 1) comprehended the repeal of all special exemptions. "Prior to the act . . . institutions and societies of this character were many of them exempted by special acts . . ." and "An intention . . . to establish uniformity is apparent." *St. Mary's School &c.* v. *Concord,* 80 N. H. 436, 437, 438. The 1926 revision of public statutory law (Public Laws), omitted section 2 of the 1913 act, which by its terms repealed "all special acts exempting property of any such . . . institution from taxation unless such property is used as specified in section 1 of this act, and all acts or parts of acts inconsistent" with the act. It was held in *Hedding &c. Ass'n* v. *Epping,* 88 N. H. 321 that while the omission in Public Laws of section 2 accomplished its repeal, it did not operate to restore the exemptions in special instances. The plaintiff urges that the ruling was *dictum,* and erroneous at that.

Granting that the same result may be reached by either of two rulings, it is not considered *dictum* to say which rule should be adopted. A rule adopted as the basis of decision of the issues involved is a judicial declaration of law constituting a precedent. The fact that

another rule would lead to the same decision does not make it available if it is an erroneous one. "A case is to be regarded as a precedent when it furnishes rules that may be applied in settling the rights of the parties." *Dubuque* v. *Railroad*, 39 Ia. 56, 80.

Moreover, in the *Hedding* case, by the amendment to the association's charter (Laws 1891, *c.* 250) all its real estate except its cottages and rented buildings were exempted. But, in the application of the 1913 act, some of its land was held taxable under certain conditions which the charter amendment did not impose. Also, the charter amendment limited the exemption to a much smaller amount in value than is fixed by the 1913 act.

The plaintiff's criticism of the decision in the *Hedding* case is that it gives section 2 of the 1913 act a broader scope of repeal than the legislature intended. It says that the section was designed to repeal special exemptions only to the extent that they were of property not used for the purposes for which the charitable institutions were incorporated. If the plaintiff's construction were adopted, the result would follow of a general exemption act excepting from its scope special exemptions of property which it exempted. In the event that the act were amended or repealed, the consistent exemptions of special acts would not be affected. Again, if the special acts limited the amount in value of the exempted property, and the amount were less than the limit under the general acts, the institutions specially exempted would not have the benefit of the larger exemption.

The plaintiff relies on the vulnerability of section 2 in its ineptness of rhetorical precision. But the legislative meaning, in the purpose to establish uniformity, is controlling. The legislature does not always employ the best selected and clearest language and phraseology to express its thought. A purpose to produce some, but not complete, uniformity is not to be found without good and sufficient reason for it. That the legislature, providing for exemptions to all institutions of the requisite character of all occupied real estate up to the stated limit of value, should modify their scope by provision that the exemptions did not replace the exemptions of special charters in their entirety, is not the more reasonable construction of the repealing clause. An exception of that part of the special exemptions from the general exemptions which by section 1 of the act included them would be strange and anomalous.

An examination of twenty-five early academy charters granting exemptions shows varying provisions of exemption. Nearly all

expressly limit the amount to the amount of property the institutions chartered are authorized to hold. Some contain restrictions in other respects. And in some are express reservations of the right to repeal and amend. Time has not been taken to examine the special charters of other institutions benefited by the act, but it is clear enough that the 1913 act in effect absorbs all special exemptions within the scope of the exemptions it grants. The principle that the greater includes the less, to destroy the separate existence of the less, is properly invoked, to produce the uniformity purposed to be attained.

The plaintiff has referred to the charter (Laws 1901, c. 232) of the Roman Catholic Bishop of Manchester, a corporation sole and authorized to hold property for the purposes of the Roman Catholic Church throughout the State. The suggestion is made that if the limit of exempted property of $150,000 provided by section 1 of the 1913 act is applicable, the act is silent in providing for the allocation of the exemption, and thus indicates a purpose to exclude it from the operation of the act. But the charter treats the corporation as a trustee of the property of each parish, which is to be liable only for the debts and obligations incurred for its use and benefit, thus in practical and equitable aspects establishing each parish as a separate entity. Any town or city where the corporation holds property may increase the exemption limit of $150,000 of its property there located under authority of the statute (P. L., c. 60, s. 24). In any event, the charter, containing no tax-exemption, is in no respect an example illustrative to support the plaintiff's theory of a limited repeal of special exemptions.

Furthermore, the plaintiff loses sight of the omission of section 2 of the 1913 act in the statutory revision of 1926. If the section until then had the meaning the plaintiff ascribes to it, it was thereafter to be read in the light of the repeal, through omission in Public Laws, of the section which, being no longer extant, thenceforth had no vitality to affect section 1 or explain its meaning or narrow its scope. And thus read, section 1 contains no suggestion of the construction urged by the plaintiff. All educational institutions are affected alike by the act, and all special charter exemptions were thereby repealed, so far as they might be. The construction of the act adopted in the *Hedding* case is affirmed.

2. The second question transferred is whether the clause of the Federal Constitution annulling state laws impairing contract obligations, renders the institutional exemption statute inapplicable to the plaintiff's charter. Taken literally and without regard to the doc-

trine of equitable estoppel later to be considered, the question is answered in the negative.

If the exemption clause of the charter was void in its irrevocable feature, it created no obligation, and hence its repeal impaired nothing. So long as the exemption remained in force and unrepealed, it was valid. The charter was granted in 1781, prior to the adoption of the State Constitution. The legislative body, known as the General Assembly, in the pre-constitutional years of the state's history by the form of government established in 1776 was expressly authorized to levy taxes, and its general "undefined and boundless authority, hastily assumed and arbitrarily exercised" (*Gould* v. *Raymond*, 59 N. H. 260, 272) permitted any course it saw fit to pursue in taxing property and persons.

The adoption of the State Constitution had no retroactive effect to invalidate a void act of the General Assembly. So far as the Assembly acted in excess of power, the Constitution was inoperative to bestow on it more or greater power than it had when it thus acted. When the State Constitution was adopted, no revocable acts passed by the General Assembly thereby became irrevocable, unless in respect to perfected action taken in pursuance of them. Under the Federal Constitution the State was obliged to respect the plaintiff's charter so far as its contractual terms had legality, but no duty to legalize illegality is thereby imposed, and the State Constitution has imposed no duty of that kind on the State in respect to the charter, since the Constitution did not make the exemption irrepealable.

The subject of special tax-exemptions has received extended consideration in review of history and authority bearing thereon, in *Eyers Woolen Co.* v. *Gilsum*, 84 N. H. 1. The case finally establishes the rule of the Constitution that the exemption cannot be granted unless it is in aid of the protective power. "As an exercise of the protective power a special exemption must find its justification in some public purpose, or public use, which is to be promoted by the exempted enterprise. As to special exemptions 'the element of some promotion of the public good, by the exercise of the protective power, is required.' *Opinion of the Justices*, 82 N. H. 561, 572, 573." *Ib.* 10. "Charters of schools, seminaries of learning, and corporations for various religious, charitable and educational purposes have been so exempted. It has not occurred to anyone to claim that the exemptions were invalid on this ground . . . [of inequality, of taxation]." *Canaan* v. *District*, 74 N. H. 517, 518.

Certainly aid to an educational institution in the State, subject

to qualifications not here requiring statement, is an exercise of the protective power, and a special exemption to the plaintiff is proper. By the Constitution (Pt. II, *Art.* 83), "Knowledge and learning" are "essential to the preservation of a free government"; "spreading the opportunities and advantages of education through the various parts of the country" is "highly conducive to promote this end," and it is made "the duty of the legislators and magistrates, in all future periods of this government, to cherish the interest of . . . all seminaries and public schools, [and] to encourage private and public institutions, rewards, and immunities for the promotion of agriculture, arts, sciences, commerce, trades, manufactures, and natural history of the country; . . . *provided, nevertheless,* that no money raised by taxation shall ever be granted or applied for the use of the schools or institutions of any religious sect or denomination."

But the validity of an exemption is distinct from the question of the right to revoke and terminate it any time. The *Eyers* case does not discuss the difference. The point there considered was whether the power to specially exempt a manufacturing enterprise existed at all. It was held that it did not since a proper public purpose was not served by its purpose. It was not in issue, or discussed, whether the due exercise of the power was broad enough to make an exemption irrevocable for its assigned term. The right to exempt as a failure to exercise authority does not manifest or develop a right to give binding effect to an exemption for an extended or permanent term. The *Eyers* case announced no inherent validity in an exemption as a contract, but it recognized the effect of the federal rule of construction then in force to uphold the exemption as a contractual obligation. Moreover, the case treats the general subject of exemptions only from the standpoint of authority granted by the Constitution. The issue of the revocability of the plaintiff's exemption depends upon the power of the General Assembly of 1781 under the Form of Government which provided for it.

The Federal Constitution requires no enforcement of invalid contracts, and the states, and not the nation, now determine between valid and invalid contracts unless a question under that constitution is presented. In all other cases, upon the issue of construction of state legislation, the state's own common law now controls, even when federal jurisdiction may be asserted in applying and enforcing it. The theory of a common law of the nation, adopted in *Swift* v. *Tyson*, 16 Pet. 1, 8, decided in 1842, has been abandoned by the case of *Erie Railroad* v. *Tompkins*, 304 U. S. 64. The federal courts now

follow a state's own judicial construction of all its laws when no issue of federal authority arises, determining in independent judgment the state law only when its conflict with the federal constitution or acts of Congress is claimed. Decision of the validity of the plaintiff's exemption is therefore to be reached by determination of the local law. "There is no federal general common law." *Erie Railroad* v. *Tompkins, supra,* 78.

It is said in the *Erie Railroad* case: "except in matters governed by the Federal Constitution or by Acts of Congress, the law to be applied in any case is the law of the State." But "the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." *Von Hoffman* v. *Quincy,* 4 Wall. 535, 550, cited in *Home &c. Ass'n.* v. *Blaisdell,* 290 U. S. 398, 429, 430. It would seem logically to follow that the New Hampshire law relating to tax exemptions is to govern and that decisions of the United States Supreme Court upon tax exemptions granted in other states are inapplicable in passing upon the exemption claimed by the plaintiff. It is not thought that regardless of the local law the Federal Constitution requires such an exemption to be held valid.

While the declaration of local law by the courts where it is in force may be held erroneous, that law, and not some other law, is to be determined, as it is thought, to test whether a contract made subject to it is valid and creative of obligation. The rule in the *Erie Railroad* case and the rule that "great weight" is to be attached "to the views of the highest court of the State" upon the issue of contract obligation (*Higginbotham* v. *Baton Rouge,* 306 U. S. 535, 538, 539) are not only consonant with each other but would seem to be in substantial and virtual accord. The *lex loci contractus* being understood to be determinative of the existence and validity of a contract, and to embrace the issue of authority to enter into a contract, it is considered that it is properly ascertained by treating it as a problem of local law, although the conclusion may be exceptional to the rule generally prevailing in other jurisdictions upon a like state of facts. It is thought that a state may adopt its own judgment and policy in classifying agreements as valid contracts or void undertakings. "The determination follows the state law." *Texarkana* v. *Company,* 306 U. S., 188, 198.

Although the *Erie Railroad* case does not affect the authority of the United States Supreme Court to act independently in passing

on the validity of the plaintiff's exemption here in issue, it necessarily, as it is thought, affects the manner of treatment in dealing with the problem. Application of a federal common law theretofore held to exist may not be made, in view of the declaration that in fact it has never existed. As it is understood, the federal Supreme Court will now determine the local law without reference to that elsewhere or generally prevailing or to the non-existent common law of the nation. Thus the difference of treatment becomes material and important. It is considered that the prior decisions of the federal Supreme Court holding that special tax exemptions are valid contracts rest on a view taken of a national common law or of special local constitutional authority therefor. And the conclusion appears to follow that the cases in which those decisions were rendered are not required, or even permitted, to be accepted as authority controlling the case here.

The clause of the Federal Constitution invoked to uphold the plaintiff's exemption is understood to be applicable to contracts having standing as agreements enforceable under the *lex loci contractus*, and to no others. Its framers must have contemplated that each state would have its own tests of a valid contract, and that a contract valid in one state might be invalid in another. Each state, in its reserved sovereignty, was expected to adopt its local policy in respect to local matters and concerns. It might, for example, discard the common-law view of a wife's merger of personality into that of a husband and give her equal and separate standing with him in capacity to contract. Again, it might declare that promises to pay for intoxicants bought should be void. It might require certain contracts to be in writing and attended with certain formalities of execution. It might distinguish between void and voidable contracts. Uniformity of contract law among the states was thus not demanded. And a state's judicial declaration of an agreement as valid or void has the practical effect of law, although in reality it only announces the law. Conceding that the announcement may be held erroneous, it is to be assumed that it will not be.

Approaching the question from the standpoint of local law, the extent of legislative power of the General Assembly in 1781 is in issue. While it is true that the General Assembly was then the government of the State, it was not the State. The State, constituted by its people or a controlling number of them, was the sovereign, and the Assembly was its agent. The Assembly, as its agent, might exercise the State's powers of sovereignty, but in the nature of things

it could not destroy or impair them. In their preservation and maintenance it had, as already stated, extensive authority going far beyond that of the legislature established by the constitution. But existence of the State imported its inherent attributes of sovereignty, without which it would be impossible to function. The State's life is continuous and the State maintains itself irrespective of changes in the government, which is but a means of exercising the State's sovereignty. The independence of the people forming the State was not an independence of the Assembly to destroy, suppress or curtail their independence. The continued existence of the State requires the continued existence of the essentials of statehood. Without sovereignty there can be no state, if it is to be independent. The Assembly had no power to qualify or modify the sovereignty of the State or the independence of the people. It could not deprive the people of their right to govern themselves or to be governed as they saw fit. The powers of sovereignty may be delegated, but not sovereignty itself. It is sometimes said that a legislature is under no unwritten restraint, but its nature as a representative body limits its powers to such as may be exercised in representation. The power of the state may be abridged only under its own action or by its express authority. Neither in external relations with other states nor in internal adjustment between the state and its people, through forms of government, may the delegated agency enact irrevocable laws. The people may limit the exercise of sovereignty by the government, through withholding it or through surrender to another government, and by their delegates chosen for the purpose, but not by their delegates chosen only to be the government.

Until the State had a written constitution every act of the Assembly was revocable at its will, and until the Federal Constitution was adopted obligations under contracts to which the State was a party might be impaired by law. The plaintiff's charter was revocable when granted. It could become irrevocable only if it was a valid contract when made, and it was not valid in so far as it divested the State of some part of its sovereignty.

It has been said that the "private right of proprietorship" granted by the Constitution does "not leave the court exposed to any temptation to set up an illimitable jurisdiction on ... the principles that hold society together" (Dissenting opinion in *Orr* v. *Quimby*, 54 N. H. 590, 616). The statement is not to be misunderstood and construed to deny to the courts all jurisdiction upon such principles. The duty of the courts to support the Constitution makes implicit the duty

to support the fundamentals on which the Constitution itself rests. The powers of government granted by the people to their representatives to administer are defined by the Constitution, and the courts may validate no action not within the powers. The private ownership of property is unquestionably a right which the government may not abridge or take away through confiscation or by other methods. And equally the government may not impair the rights of the people in their existence as a state or in change or amendment of the government they have established. The people are not "controllable by any other laws than those to which they, or their representative body, have given their consent" (Const., Pt. I, *Art.* 12), and their representative body may enact no laws which the constitution does not permit. If the legislature might enact laws of permanently binding force, the State's right to alter its form of government, as provided for by the Constitution, would suffer. The Constitution denies to the people's representatives any right to cripple statehood, and any contract having that effect or tendency is to be adjudged a nullity by the courts in their obligation to uphold the denial.

If legislative power may be surrendered or abdicated, yet power not granted may not be assumed. An irrevocable exemption from taxation is an attempted alienation of the taxing power. It does not grant or delegate the power, but if valid it would destroy the power, and there is no legislative power to destroy.

The courts which uphold the contractual view of the exemption universally, and with virtual inconsistency, measure the scope of the exemption with as short a yardstick as strict construction can fashion. In conventional phrase, ". . . as the power to tax is an exercise of the sovereign authority of the State, essential to its existence, the fact of its surrender in favor of a corporation or an individual must be shown in language which cannot be otherwise reasonably construed, and all doubts which arise as to the intent to make such contract are to be resolved in favor of the State . . . ." *Seton Hall College* v. *South Orange,* 242 U. S. 100, 106. In other words, what is wrong to do may be done, so far as it is done.

It is not only "the American theory of government" (*Attorney-General* v. *Taggart,* 66 N. H. 362, 369) but the Constitution itself proclaims that the State is a sovereign political body formed by the people inhabiting its territory. Const'n, Pt. II, *Art.* 1. The view of sovereignty is announced in the Constitution (Pt. I, *Art.* 8) in this concise statement: "All power residing originally in, and being derived

from, the people, all the magistrates and officers of government are their substitutes and agents, and at all times accountable to them." This conception prevailed in the period from the State's independence to the establishment of the Constitution. It announced not a new doctrine, but one already outstanding.

As attributes of this sovereignty, it is recognized that among the powers essential to the maintenance of government which cannot be alienated or impaired, three important ones are the police power, taxation and eminent domain. That the Constitution recognizes them either expressly or by necessary implication does not signify their non-existence in the pre-constitutional life of the state. ". . . the reservation of essential attributes of sovereign power is also to be read into contracts as a postulate of the legal order." *Home &c. Ass'n* v. *Blaisdell*, 290 U. S. 398, 435.

"Perhaps the most interesting question which arises in this discussion (of legislative charters to incorporated bodies) is, whether it is competent for the legislature to so bind up its own hands by a grant as to preclude it from exercising for the future any of the essential attributes of sovereignty in regard to any of the subjects within its jurisdiction; whether, for instance, it can agree that it will not exercise the power of taxation, or the police power of the State, or the right of eminent domain, as to certain specified property or persons; and whether, if it shall undertake to do so, the agreement is not void on the general principle, that the legislature cannot diminish the power of its successors by irrepealable legislation, and that any other rule might cripple and eventually destroy the government [*sic*, the State] itself. If the legislature has the power to do this, it is certainly a very dangerous power, exceedingly liable to abuse, and may possibly come in time to make the constitutional provision in question [against laws impairing the obligation of contracts] as prolific of evil as it ever has been, or is likely to be, of good." Cooley, Const'l Lim's. (4th *ed.*) 341.

Authority need not be cited for the principle that neither the police power nor that of eminent domain may be curtailed or surrendered by the legislature. The plaintiff would hardly claim that if its charter, in addition to the permanent tax-exemption it contains, had included a perpetual right to sell intoxicants and conduct a lottery, as aids to its maintenance, the right would be protected as an inviolable contract. Nor would the State's promise that none of its property should be ever taken for a highway for which a public need might arise be a binding obligation. In consistency, a depriva-

tion of the power to tax seems equally beyond legislative privilege and authority.

If the plaintiff's theory is sound, and the tax exemption applies, as it claims, to all the property which it may hold pursuant to the act (Laws 1883, c. 167), amending the charter, its freedom from taxation might become a matter of grave economic importance. The investment of its funds in New Hampshire real estate, with its plant investment added, would aggregate nearly $15,000,000 in value of property which if all taxable would produce a tax of $450,000, at a rate of 3%. That no such outcome is probable, may be conceded, but the illustration indicates the possibilities of an alienation of the power to tax. Even without the investment of funds in real estate, the tax would be $150,000 or more, and it is conceivable that the former statute taxing securities might be revived.

This contemplation of serious loss of public revenue was given expression, as a reason for the rule of strict construction in passing on exemptions, in the following statement in *New London* v. *Colby Academy*, 69 N. H. 443, 445, 446: "The total value of property which the defendants and other similar institutions in the state are authorized to hold must be very large .... Exemption from taxation of the real estate of these institutions would be a great inducement to them to invest their funds in local real estate. If they yielded to the inducement, an unequal burden of taxation would be thrown upon other property holders .... It cannot be presumed that the legislature intended to aid such institutions to this extent."

All authorities concede the policy against perpetual exemptions, as an infringement of sovereignty. But in permitting it in special cases, the courts have drawn no line. In principle, a slight invasion of fundamental law is in character the same as a substantial one. The principle has been considered applicable to the exercise of unconstitutional power. *Ashuelot R. R. Co.* v. *Elliot*, 58 N. H. 451, 457. And there was a fundamental common law in 1781 which forbade the Assembly to act in any excess of power. By that law, no acts in derogation of the sovereignty of the people were valid. The courts as well as the Assembly were the agents of the people, and were under obligation to recognize the legislative limitations of power. The Assembly was authorized to change the common law, but not to the extent of that part of it necessarily in force to maintain the State's integrity and capacity to fulfill its essential functions. For the courts to give judicial sanction to all acts of the Assembly would have been to make themselves its agents instead of agents of the people, and to

have consented to measures tending to undermine and weaken the State's sovereignty, upon which its existence depended.

In *Washington University* v. *Rouse*, 8 Wall. 439, 441, the following was said in the dissenting opinion: "We do not believe that any legislative body, sitting under a State constitution of the usual character, has a right to sell, to give, or to bargain away forever the taxing power of the State. This is a power which, in modern political societies, is absolutely necessary to the continued existence of every such society . . . . To hold, then, that any one of the annual legislatures can, by contract, deprive the State forever of the power of taxation, is to hold that they can destroy the government which they are appointed to serve, and that their action in that regard is strictly lawful." No adequate answer to this reasoning has been found.

It is not doubted that the General Assembly had power to grant revocable special exemptions of every sort and description, whether or not the power could be deemed to be the protective power later granted by the Constitution in limitation upon arbitrary power. But the legislative exercise of the protective power is to be restrained from action invading the higher protection of the State on which its full, complete and undiminished sovereignty is dependent. This, no legislature can alienate. If contractual features are not involved, one legislature may not bind its successors by action within the protective power. A valid purpose must be accomplished by valid means. *Opinion of the Justices*, 87 N. H. 492, 495. The requirement of protection may become not only obsolete, but in need of change. Contractual obligations which undermine the fundamentals of statehood and government cannot be an exercise of the protective power. "The General Assembly . . . could have . . . no greater power, in relation to this subject [of exemption from taxation], than the legislature now possesses, under the constitution." *Brewster* v. *Hough*, 10 N. H. 138, 143.

The view advanced in *Opinion of the Court*, 4 N. H. 565, 566, that "an act of the legislature, in order to have the force of a statute, must therefore, be neither repugnant to reason, nor to the constitution", is now unsound in the first alternative. The assertion of Coke that the common law will adjudge void an act of Parliament against common law and reason, has become discredited. "But experience of review of colonial legislation with respect to its conformity to charters, applied to written constitutions and bills of rights, led us in the United States to carry the supremacy of law to its logical

limits and practically adopt Coke's conception of a control of legislation upon fundamental principles of right and reason." Pound, Spirit of Common Law, 75. And it may at least be said that in the pre-constitutional life of the state, there was a common law against excessive exercise of power as well as against its usurpation. The Constitution's provisions that "The people of this state have the sole and exclusive right of governing themselves as a free sovereign, and independent state," (Const'n, Pt. I, *Art.* 7) and that "whenever the ends of government are perverted, and public liberty manifestly endangered, and all other means of redress are ineffectual, the people may, and of right ought, to reform the old, or establish a new government" (*Ib., Art.* 10), stated a political philosophy acted upon from the time the dependent colony became an independent state, and was incorporated in the common law of the State. If the "Form of Government" established in 1776 recognized some remaining colonial dependence, full statehood dated from the Declaration of Independence which followed shortly afterwards.

No authority has been cited for the irrevocability of a pre-constitutional tax-exemption granted by the General Assembly. It is urged that the *Dartmouth College* case (*Trustees of Dartmouth College* v. *Woodward,* 4 Wheat. 518) is authority. But the diversities are great. In the *College* case, no issue of taxation or eminent domain was raised. The act of 1816 (Laws of N. H., *c.* 32, *p.* 505) was not a valid exercise of the police power. It was confiscatory and in conflict with the Bill of Rights. The college charter "is a contract for the security and disposition of property." *Trustees of Dartmouth College* v. *Woodward, supra,* 644. The charter parted with no sovereign powers of Great Britain, and later came in no conflict with those of the State. It was a grant by the Crown within its authority. Both its charter and that of the plaintiff may be contracts. But the plaintiff's charter contains an invalid clause of irrevocability of the tax-exemption, and the contract is therefore not binding in respect thereto. And the subsequent adoption of the State and Federal Constitutions did not validate it. They did not change its character.

It is said that a special exemption is a grant of a property right. This cannot be so. If it were, then all special exemptions would be valid. The exemption may be of benefit to property, but it is no more an attribute or incident of property than a police law whose enforcement adds to the value of property. It may not readily be said what is included in property rights, but an exemption, as a

favor, is not to be thus classified. It is a grant of relief and aid. In analysis, a special exemption no more partakes of a property right than a general exemption of classification.

In the judicial history of the State the view here taken has received recognition.

"The power of taxation is essentially a power of sovereignty, or eminent domain; and it may well deserve consideration whether this power is not inherent in the people, under a republican government; and so far inalienable that no legislature can make a contract by which it shall be surrendered, without express authority for that purpose, in the constitution, or in some other way directly from the people themselves.

"But there is a material difference between the right of a legislature to grant lands, or corporate powers, or money, and a right to grant away the essential attributes of sovereignty, or rights of eminent domain.. These do not seem to furnish the subject matter of a contract." *Brewster* v. *Hough*, 10 N. H. 138, 143, 147.

In *Mack* v. *Jones*, 21 N. H. 393, a case in which a town conveyed land "free from taxes, till grass shall cease to grow and water to run," the court said (*p.* 395), "The power of taxation is an attribute of sovereignty belonging to the people; and this power, so far as it has been granted at all, has been delegated under our constitution to the legislature."

In *Opinion of the Court*, 58 N. H. 623, the doubt was stated in this manner: "A perpetual alienation of the whole power of taxation would be the destruction of government; and the dangerous tendency of legislation suspending any part of that power, for any period, is manifest."

In *Trustees of Phillips Exeter Academy* v. *Exeter*, 58 N. H. 306, the court commented that the taxing power is "indispensable to the existence of every independent government" and "resides in government as a part of itself."

In *Dow* v. *Railroad*, 67 N. H. 1, 48, it is said: "If the point were not already adjudged, it would admit of grave consideration whether the legislature can give up the power of taxation any more than they can give up the police power or the power of eminent domain." As the statement is understood, the reference to adjudication is under a common law of the nation then held by the federal courts to exist, but now held by them never to have existed, as already has been pointed out.

Throughout the course of judicial thought in the State, doubts

and disapproval of any alienation of the taxing power have been expressed. A natural reluctance to guide the future in view of the serious effect on accrued situations may partly explain the avoidance of definite statement. But the chief reason is thought to be the federal rule adopting a mythical common law of the nation in place of local law, which operated to blockade decision of the local law. The rule being no longer extant, state courts may now apply their own law and the federal courts will determine that law as controling.

In summary, sovereignty is supreme power which can be lost, alienated or impaired only by those possessing it, by themselves or through delegation therefor. Taxation is an essential constituent and element of the power. A body delegated to exercise the powers of sovereignty may exercise only such as it has received grant of authority to exercise. The General Assembly received no bestowal of authority to pass measures affecting the power of taxation. While a legislature may in proper cases surrender or forego the exercise of its power, it is without authority to alienate the power or to prevent the full exercise of it. The plaintiff's exemption in its irrevocable feature is a measure affecting the power to tax and is therefore void.

3. The inquiry whether the plaintiff is entitled to the benefit of the charter exemption as to any properties now held by it, presents for consideration the doctrine of equitable estoppel against a claim of invalidity and its application here. Otherwise stated, is the defendant barred from claiming that the exemption is subject to repeal?

It would seem that if an abridgement of the power to tax may not be accomplished by direct legislation to that end, it may not be suffered through any device in the employment of legal doctrines and principles. But in view of authority in declaration of the doctrine, it is considered for its bearings upon the plaintiff's claim. If while the federal rule of construction adopted in *Swift* v. *Tyson*, *supra*, was in force, the exemption received an authentic construction of contractual validity, it may not now be annulled.

The doctrine is set forth in *Dow* v. *Railroad*, 67 N. H. 1, 48, 49, after a prefatory declaration that "Legislators are agents (N. H. Bill of Rights, *art*. 8) employed, not in the rescission, but in the performance, of the social contract; and between a total and a partial rescission, no line of legal principle can be drawn as a boundary of their agency", in the following statement: "But the integrity of their principals is not to be unnecessarily impugned by other agents

employed in the judicial department. The social contract requires an exact and constant adherence to justice and honesty as virtues indispensably necessary to preserve the blessings of liberty and good government. N. H. Bill of Rights, *art.* 38; Const. of N. H., *art.* 83. And the construction, settled in this state by universal understanding and usage, applies the doctrine of equitable estoppel to such partial and temporary relinquishments of legislative power as have heretofore been made and acquiesced in. . . . If any of the promisors deny the authority of their agents to make the exempting bargain with him [the promisee], their objection should be seasonably presented for enforcement by an adjudication of the rights of both parties that will prevent his relying upon a promise judicially decided, or universally believed to be valid. When their silence and apparently unanimous assent have led him to change his position, and won for them the stipulated benefit of the investment made by him on the faith of the exempting agreement, they cannot contest their agents' authority to make the agreement . . . Neither the state nor a municipality can gain an unfair advantage from the promisee's ignorance of law by postponing, till his investment is completed, an objection which is unseasonable after they receive the benefit of their agents' unauthorized contract, and which an honest man, in their situation, would raise before that time or never. Whether this is or is not a sound construction of the constitution we need not inquire. It has been settled too long to be disturbed, and is too firmly planted in moral principle to excite a desire for its reversal, but it cannot be extended beyond cases of equitable estoppel. It detracts nothing from the necessity of strong evidence to show an intention of the legislature to exercise a releasing power which they do not possess, and which cannot be sustained against a seasonable objection."

In substance and effect this pronouncement gives to general understanding, or practical construction, a weight which is deemed undue. Granting the right to rely on judicial construction, and granting the value of general understanding, or practical construction, as evidence in aid of judicial construction, it is not thought sound doctrine that understanding or usage without the stamp of judicial approval is reasonable and proper as a test to bar an attack on the validity of an exemption.

Under general legal principles, public agents have no power to bind the State or any of its subdivisions by an apparent authority in excess of their actual authority. *Smith* v. *Epping*, 69 N. H. 558;

*Storrs* v. *Manchester,* 88 N. H. 139, 142. The grantee of an exemption is chargeable with notice of the Constitution and limitations of legislative power, and he may not in reasonable justice rely on the legislative assumption of power merely because the legislature assumes it or the executive department of government acts pursuant to it or the unofficial public do not question it. Final interpretation of the constitution belongs to the judicial department of government, and ignorance of the fact is no basis for a right to claim estoppel. Until then the Constitution has not been authoritatively construed with the effect of a judgment. The mere election or appointment of agents, public or private, does not hold them out to possess more authority than is actually bestowed upon them.

In principle, when a law is void, the state has not acted. "An unconstitutional act is not a law; it binds no one, and protects no one." *Huntington* v. *Worthen,* 120 U. S. 97, 101, 102. ". . . if the legislature has not acted under authority, no action has been taken by the State . . . ." *Conway* v. *Board,* 89 N. H. 346, 348. Conduct of executive agents of the state in treating a void statute as valid would seem to be equally inaction on the part of the state. Its agents may no more bind it in assuming the statute to be valid and acting upon the assumption than may the agents who have assumed authority to enact it. If the legislature has acted *ultra vires* in the enactment of the statute, so do executive agents of the state in enforcing it. If the State has not acted, it can hardly be charged as though it had acted. And not having acted, it cannot be estopped as though it had acted.

The constitutional direction that laws shall be just and conformable to social virtues does not contemplate that laws thought by the courts to be otherwise shall be held repugnant to the instrument. The direction is a precept and not a condition of validity. The issues of the qualities of legislation prescribed by article 38 of the Bill of Rights are not justiciable. If the precept for all agents of the State to act in justice and reason is an obligatory mandate on which the validity of legislation depends, then it is applicable to all legislation, and the cardinal rule that the legislature alone passes on the moral virtue of its enactments is disregarded. The exercise of legislative good faith is not a subject of judicial review. And the principle of sovereignty by which the State cannot be sued against its consent (*Opinion of the Justices,* 81 N. H. 573, 577) would seem to defeat a claim of estoppel presented as an affirmative defence. Not being suable *in invitum,* it may not be subject to an estoppel against the

assertion of its rights, when it has not consented to their defeat, although facts constituting estoppel as between individuals are shown.

The State, not having acted, has made no misrepresentation nor has it held out any promise. If it receives benefit in return for its agents' promise, the benefit is not restorable. The rule of equitable estoppel, as customarily defined, is therefore unavailable. The reasoning in the *Dow* case, resting upon the premise that the State may be bound by conduct of its agents outside their actual authority, seems to disregard an accepted principle of the law of agency.

But when the validity of a law has been upheld by judicial construction, it is a declaration by a constitutionally authorized tribunal. The declaration stands as that of the State, and becomes, by necessary effect, absorbed into the Constitution, and adopted as though a part of it. The tribunal has acted in the required exercise of its due authority. Exerting no excess of authority, its action is wholly within its prescribed sphere and functions. And its judgments are enforceable. It is in this aspect that the State may be bound, as having, by the due procedure of its agents, accepted its pronouncements.

A judgment is based upon the law of the case, and that law remains in force, in application to other cases, until it is overruled. If the judgment proves in time to be erroneous, the error is that of the State. But although error in the judicial declaration of the law is later judicially determined, the error does not deprive the judgment in which the error is committed of constitutional effectiveness. If the process accomplishes some slight measure of constitutional change, the necessities of orderly government require it, and the Constitution, by the form of government it has established, contemplates it.

Under this theory of construction the plaintiff cannot maintain a claim of estoppel based upon any local judicial view of legislative power. No judgment has heretofore been rendered holding that an exemption is irrevocable for the term for which it is granted, either in decision of the plaintiff's rights or as an authoritative precedent. Since the adoption of the State Constitution, the validity of special exemptions and their exposure to repeal was an undetermined issue for nearly a century and a half. Not until the case of *Eyers Woolen Co.* v. *Gilsum*, 84 N. H. 1, decided in 1929, was their constitutional status definitely adjudicated. However, it was early held by the federal courts that a special exemption was a contract whose obligation could not be impaired, and under the ruling of construction in *Swift* v. *Tyson, supra*, such an exemption granted by any state was

valid, in application of the Federal Constitution and laws, although the courts of the State held it invalid."

This is understood to be the underlying explanation of the advice furnished in *Opinion of the Court*, 58 N. H. 623, that local construction of the Constitution in passing on the validity of a special exemption was immaterial. "By that stipulation, the state said to owners of money,—'In addition to such faith as our word is entitled to, we invite you to put your trust in a binding contract, the constitutional inviolability of which has been settled by the court whose judgment is final and conclusive. If you doubt our honor, you can confide in the federal guaranty.' " *Ib.*, 624.

No federal case holding a special exemption to be a valid contract is found prior to that of *New Jersey* v. *Wilson*, 7 Cranch. 164, decided in 1812. The decision in *Swift* v. *Tyson, supra*, was rendered in 1842. It was thus thirty years after the grant of the plaintiff's charter before any authentic judicial precedent for the irrevocability of an exemption existed, and it was thirty years more before the federal courts applied their own views of contract law in place of local construction. It can hardly be claimed that until then any judicial precedents existed to permit the operation of estoppel, especially in view of the local trend in conflict with the federal view.

"The statement in the *Opinion of the Court*, 58 N. H. 623, 625, that 'So long as the existing laws remain unrepealed, and the constitutional construction heretofore adopted remains unchanged, contracts hereafter made under those laws and that construction will be valid', is not to be taken in an unlimited sense. In order that the compact shall be thus beyond investigation, it must have been made in honest and reliable reliance upon the stability of the construction of the constitution and the consequent validity of the laws." *Eyers Woolen Co.* v. *Gilsum*, 84 N. H. 1, 6. And the plaintiff in the *Eyers* case was held, under the facts, to have acted upon the vote for the exemption without proper reliance.

The plaintiff here had no stable construction to rely upon, even of custom and understanding, when it entered upon its enterprise, and it could proceed under its charter authority with no reliance except upon an unenforceable and repealable promise. After the enterprise was launched and the Academy established and its service carried on, no evidence is found tending to show that its growth and development were fostered in any reliable dependence upon a settled construction of the legal standing of the exemption. So far as appears, a known taxability of its property would have been no deter-

rent in the advancement and enlargement of its facilities. There is evidence of uncertainty of the effectiveness of the exemption as a perpetual benefit. The general statute of 1842 (Rev. St., c. 39, s. 2) excepted the real estate of "seminaries of learning" from taxation, so that in respect to the plaintiff's real estate it was understood as an additional enactment of relief, if it did not also have superseding effect. This exception has ever since remained in force. By *Trustees of Phillips Exeter Academy* v. *Exeter*, 58 N. H. 306, decided in 1878, the plaintiff was informed that the question whether its charter created a binding contract of freedom from taxation was unconsidered. In *Opinion of the Court*, 58 N. H. 623, delivered in 1879, the court avoided the issue of correct constitutional construction, and on the issue of estoppel based its opinion upon action in reliance upon the promise inhering in a special exemption for some period of time. Moreover, in pointing out that the practical construction might be in conflict with the true construction, the logical conclusion would seem to be that reliance on the practical construction was no longer safe, although the court advised to the contrary. In this aspect the "persuasive value" (*Opinion of the Justices*, 84 N. H. 559, 583) of the opinion may be questioned.

The defendant commenced to tax the plaintiff on certain of its property in 1875. Litigation followed (*Trustees of Phillips Exeter Academy* v. *Exeter, supra*). About twenty years later, on renewed litigation a compromise was effected. In 1915 the plaintiff's property was assessed under the 1913 act, and the assessment was compromised "without prejudice to any rights of either party or any legal proceedings relating to future taxation." While the compromise is not evidence as an admission upon the issue of rights and liabilities, it is evidence of some doubt of the law applicable in making the assessment.

If this evidence in some features has no great weight, altogether it indicates an unstabilized construction on which honest and reasonable reliance might not be placed. The issues of proper construction and estoppel are closely connected, and their interrelation has produced difficulty, if not confusion, of treatment in their conflicts and in their aspect under the rule of construction in force until recently in the federal courts. The doctrine of estoppel has its conceded moral strength. But it should be confined not to intrench unduly upon the mandate of equality. At best, it leads to the invidious situation where one person acting in reliance on the exemption may, while another not thus relying may not, prevent the presen-

tation of the real constitutional issue in controversy, with the paradoxical result that the reliance may entitle one constitutionally to an unconstitutional benefit. It amounts to a special waiver of the Constitution in a given case, which is altogether at odds with the spirit and mandates of the Bill of Rights forbidding special favors.

The "necessity of strong evidence to show an intention of the legislature to exercise a releasing power which they do not possess" (*Dow* v. *Railroad, supra,* 50) is properly invoked, and on the facts presented the evidence is insufficient to support a finding by which an estoppel in the plaintiff's favor exists.

In particular it is inapplicable to any property acquired by the plaintiff since 1883 under the enabling act (Laws 1883, *c.* 167) which permitted it to receive property to such an amount as might be considered necessary for its use and advantage. The charter limits of property which might be held were the limits of exemption from taxation. The exemption of all of the academy's property was of all it might hold, and not of more than the charter allowed. Employing the usual rule of construction that a clause is to be read in the light of the context, the conclusion is reasonable that the clause of exemption had reference to the clause of limitation. The General Assembly in effect said: "You may hold so much property and it shall never be taxed." And there is no thought expressed in the 1883 act that the exemption clause of the charter should apply to the property thereby authorized to be acquired. The act as an amendment of the charter was not of repeal of the charter limitation and a substitution in lieu of the limitation, but was of authorization in addition to that of the charter. As the case states, the amendment was sought to enlarge the plaintiff's power to hold property. Its taxability was not a matter of consideration, so far as appears.

Furthermore, as the defendant has argued, the 1883 act is subject to amendment or repeal, at least in prospective effect, in view of its passage subsequent to the general law reserving the right in respect to corporate charters and powers (G. L., *c.* 147, *s.* 18, now P. L., *c.* 226, *s.* 12). As already appears in the consideration of the 1913 act (Laws 1913, *c.* 115), it repealed the plaintiff's charter exemption so far as it lawfully might, and the 1883 act, being thus enacted subject to repeal, was repealed by the 1913 act, in respect to any tax exemption which it might be assumed to contain.

4. In view of the answers to the two preceding questions (2 and 3), the inquiry as to the property or classes of property of the plaintiff now exempted by force of the charter needs no answer.

5. The answer to the inquiry how far the statute (P. L., c. 60, s. 5) exempts the plaintiff's property involves a preliminary issue of the construction of the legislation.

By former statute (P. S., c. 55, s. 2), real estate "except houses of public worship, twenty-five hundred dollars of the value of parsonages owned by religious societies and occupied by their pastors, schoolhouses, seminaries of learning, real estate of the United States, state, or town used for public purposes, and almshouses on county farms," was taxable, from 1891 to 1926.

By statute, in force since 1926 (P. L., c. 60, s. 5), "Real estate . . . is liable to be taxed, except houses of public worship, schoolhouses, seminaries of learning, real estate of the United States, state or town used for public purposes, and almshouses on county farms, and as otherwise provided."

The institutional exemption law of 1913 (Laws 1913, c. 115) heretofore construed did not repeal the exemption provision contained in the Public Statutes of 1891. The retention of the provisions, with modification, in the Public Laws of 1926, proves that the legislature in 1913 intended no such repeal. In further proof, the act of 1913 exempted none of the publicly owned property excepted by the Public Statutes from taxation, and the act also exempted personal property of the institutions it catalogued. It follows that the 1913 act, leaving the Public Statutes in respect to the exceptions therein listed in full force, established new and additional exemptions, supplementary to the exceptions. It was in no respect a superseding act, and it did not include or cover the existing exceptions. Already non-taxable, the real estate excepted by the Public Statutes was unaffected by the 1913 act. A repeal of the 1913 act would not have made any of the exceptions of the Public Statutes taxable. As to houses of public worship and seminaries of learning, their owners are entitled to enjoy both benefits, and the conclusion is impelled that the 1913 act granted to them exemptions on their property other than that already excepted.

The defendant argues, however, that the final phrase "and as otherwise provided," appearing in the 1926 revision of Public Laws has reference to the exemptions continued under the 1913 act (now, with changes, reënacted as Public Laws, c. 60, ss. 22, 23), with effect to defeat the exceptions therein of property not publicly owned, for any value in excess of $150,000. The contention is not adopted. The phrase in its wording denotes additional exceptions to those specified in the section of which it is a part. It is in common usage

as a phrase to avoid an inference of complete exclusion or inclusion. In effect, it says here that not only the stated exceptions shall be non-taxable, but also any others which might be already established by other legislation. It is a clause of addition and not of limitation. If it had been, the word "except" instead of "and" would have been used. The phrase was added by a commission credited with the use of exact and accurate language having certainty of meaning. It is improbable that if the limit of value set in the institutional exemptions act had been intended to be applicable to the section of which the omnibus phrase is a part, clarity to evidence the intention would not have been employed. Under the defendant's theory, either all of the exceptions, public as well as private, would be subject to the limitation, or it would read in a qualification making it applicable only to the private ones. The phrase is not construed to have either of such effects, in the absence of evidence showing a purpose of such a substantial, and in some cases radical, loss of exemption as would ensue, unless relief were obtained by municipal vote. By the section in which the omnibus phrase appears certain real estate is not taxable. By the section relating to institutional exemptions certain other real estate is exempt. The phrase was evidently intended to refer to the latter section and embrace its exemptions, as well as others such as reclaimed swamps (P. L., c. 60, s. 13), burial places (*Ib.*, s. 21), service exemptions (*Ib.*, s. 26), timber on classified forest land (*Ib.*, s. 32), property of insane persons (P. L., c. 63, s. 5), and county courthouses and jails (*Grafton County* v. *Haverhill*, 68 N. H. 120). There is no provision in the limitation of value for institutional exemptions that the limitation shall apply to any others, and it logically follows that the section is not subject to it. The phrase does not adopt the limitation, but merely adopts any legislation enlarging its scope if "and" is given its usual meaning and qualifying its scope even if given the meaning of "except." But there is no statute having any qualifying effect upon the exceptions of the section.

The exception of seminaries of learning dates back to 1842 (Rev. St., c. 39, s. 2), and what property or character of property of an educational institution is thereby included, with particular reference to the plaintiff's, is to be determined. For the same reasons that the 1913 act applies to the plaintiff, the act of 1842 became the sole controlling law for exemption of its property in place of its charter exemption, until the 1913 act was passed. Since then both acts govern.

In *Warde* v. *Manchester*, 56 N. H. 508, the exemption was held to

apply to buildings used for dormitory purposes of an academy as well as to buildings used only for instruction. But the distinction was not considered by the court, and the issue raised was apparently limited to the religious character of the academy.

In *New London* v. *Colby Academy*, 69 N. H. 443, a building used partly as a dormitory for students and partly by an instructor in the academy was held taxable under the same statute. The statutory expression of seminaries of learning was thus construed (*p.* 444): "It is not the real estate of seminaries of learning that is excepted, but only 'seminaries of learning'; that is to say, buildings used for school purposes . . . . 'Seminaries of learning,' like 'school houses,' are buildings appropriated for use by schools."

In *Trustees of Phillips Exeter Academy* v. *Exeter*, 58 N. H. 306, a building partly used for students' rooms and board was held taxable, upon a construction of the plaintiff's charter exemption that it applied only to property "used by them directly in carrying on their enterprise,—to their school-houses and lands, devoted immediately and exclusively to the purposes of their grant." The court distinguished between property held for use and property held for benefit short of use. While the charter was there construed, and not the general statute exempting "seminaries of learning," the statute, although then in force, was not relied upon as a ground of exemption. "It is true that this decision related to the construction of the academy's charter and not of the general law under consideration, but the terms of the charter were quite as broad in meaning as those of the general law. If the general law had been regarded as broader than the charter, the exemption would probably have been claimed under it." *New London* v. *Colby Academy, supra,* 446.

The plaintiff seeks to weaken the authority of these two cases by stressing the fact that the buildings taxed were used only in part for strictly private use. But in this situation, if use for student quarters had been considered educational use, like that of buildings where teaching and instruction, as the elementary features of education, were conducted, an apportionment of value between the educational and other use would have been an available procedure. Such a method was considered proper and not impractical in *Young Men's Christian Ass'n.* v. *Keene*, 70 N. H. 223, and in *Hedding &c. Ass'n* v. *Epping*, 88 N. H. 321.

The view seemingly taken in *St. Paul's Church* v. *Concord*, 75 N. H. 420, 424, that a division in use of a building by which one part is used for school purposes and the rest of it for other purposes bars it from

partial exemption, is not thought to accord with the authority of the cases cited in support of the view (*Trustees of Phillips Exeter Academy* v. *Exeter, supra,* and *New London* v. *Colby Academy, supra*) or with the intent of the statute. It is fairly conceivable that an academy building might be partly used for strictly academic uses and the rest of it rented for uses in no way educational, with a result of taxability of the rented part, but not of the other part. A building partly used for class rooms and partly as a dormitory clearly may receive a proportional division of value according to the parts assigned to the different uses.

In the *Phillips Exeter Academy* case about two-thirds of the buildings taxed was used for students' quarters and in the *New London* case one-fourth of the rooms in the building on the property taxed were set apart for students. In each case the students were tenants of the owner, as landlord, and not of an intervening lessee. Assuming that the cases might perhaps be more definite and enhanced in authority if the special feature of partial use did not appear, yet the decisions would evidently have been the same without that feature. The thought and reasoning of the court in both cases was of the distinction between direct educational use and other use of an appurtenant character. Buildings designed for school purposes were held to include more than buildings which were designed for exclusive use by schools, and which alone were tax-exempt.

The distinction may be a narrow one, but the authority for it is sufficiently well established and rests on valid principles of statutory construction. It is not thought that there is adequate reason to overturn its import and spirit.

The 1913 act *c.* 115 was passed in the light of it, and with one purpose to expand exemptions by substituting "occupancy for exclusive use" (*St. Mary's School &c.* v. *Concord,* 80 N. H. 436, 438). The act in providing that real estate "owned and occupied" by the exempted institutions, "their officers or their students for the purpose for which they are incorporated" was intended to bring within the scope of exempted property much more in character than was already exempted under general law. "The rejection of exclusive use as the test found in the earlier statutes and applied by the court is significant, especially as exclusive occupation does not appear a necessary requisite of exemption." *St. Mary's School &c.* v. *Concord, supra,* 438. The 1913 act thus confirms, by legislation, the confines of meaning of seminaries of learning, in the existing statute of their exemption.

But exclusive use does not constrict seminaries of learning, in their

statutory meaning, to the buildings, or parts of them, in which learning is taught and the process of actual education by instruction carried on. The limitation of the rule of strict construction, in application to claims of exemption from taxation, that "it is not so narrow and rigid in its application as to defeat the lawmakers' intention ascertained from all the competent evidence" (*St. Paul's Church* v. *Concord*, 75 N. H. 420, 423) is to be observed in the undertaking to ascertain the legislative meaning. Granting that the legislature, in passing a tax-exemption law, is aware of the rule of strict construction and expects its application to the law, it is expected to use language of strictness on its part, and if other language would import a stricter sense of meaning, the failure to use it is evidence of weight against such a sense. To say that a statutory exemption act means, by its terms, no more than a necessary minimum of exemption, is to evince a judicial policy against exemptions which is of doubtful propriety. In any event, classifications between taxable and non-taxable property are not to be tested by a hard and fast measure favoring taxability, and the statute under consideration is of classification, and not a special exemption. As to charities in general, the law's good-will towards them is not to be changed to a hostile attitude, in passing upon legislative favor for them. In determining whether a particular charity is within an exempt classification, or how much of its property comes within the exemption, resort to "rigorous strictness and a technique of narrowing application" does not best construe the expression of legislative will. *Young Women's Christian Ass'n* v. *Portsmouth*, 89 N. H. 40, 42.

In *New London* v. *Colby Academy, supra*, the court rested its decision upon the fact that buildings "wholly used for revenue" (*p*. 447) were not exclusively used for school purposes, and hence were not exempt seminary property under the statute. The case is not authority beyond an interpretation of the statute to require exclusive use and that there is no such use of rented property.

Exclusive use is not to be defined as absolute exclusiveness of use. "While that result would be in accordance with a rule of very strict construction, it would be so opposed to the evident objects of such legislation and to the universal understanding of the practical meaning of language as to commend itself to no one; hence the court ought not to be bound by it. Nor do the cases cited [those of *New London* v. *Colby Academy, supra*, and *Trustees of Phillips Exeter Academy* v. *Exeter, supra*] use the word in such a narrow sense. . . . A reason-

able construction must be given to the statute. Scholastic strictness of definition cannot be adopted, if it prevents that result." *St. Paul's Church* v. *Concord, supra,* 423, 424.

The law makers of 1842 had in mind seminary property as it was then used for seminary purposes and they also had in mind possible development of such use. Clearly, even then it was understood that schoolhouse grounds were adjuncts of schoolhouses, and might be used as playgrounds, which in turn and in time to come, might be equipped with a gymnasium. ". . . legislative enactments in general and comprehensive terms, prospective in operation, apply alike to persons, subjects and business within their general purview and scope existent at the time of the enactments and to those coming into existence subsequent to their passage." *Haselton* v. *Stage Lines,* 82 N. H. 327, 332.

These considerations and tests of construction lead to the conclusion that seminary property fairly to be regarded as exclusively in use for educational purposes, either directly or in adjunction thereto, without being rented or devoted to commercial or business use, is tax-exempt.

The exception of the property of seminaries of learning from taxation, in force since 1842, is unaffected by the amendment (Laws 1931, *c.* 148) to the statute of institutional exemptions. The amendment in terms is only of that statute.

Upon a petition for abatement the plaintiff is entitled only to such relief as justice requires. "If the whole tax assessed against the plaintiffs does not exceed the sum which they ought to pay, they are not entitled to an abatement because a part of the tax is erroneously assessed." *Connecticut Valley &c. Co.* v. *Monroe,* 71 N. H. 473, 479. The defendant's position predicates a claim that, considering its value, much of the plaintiff's untaxed property is taxable. The taxability of the untaxed property is therefore to be passed upon, as well as of the property taxed. The issue of exclusive use is one of fact, but if the facts are not in dispute and only one conclusion can be drawn from them, the issue becomes one of law.

Aside from the principal's house, the original academy building, Alumni Hall, the Central Heating Plant, and two unimproved lots, the untaxed property is all to be classed as seminary property and hence not taxable. The properties specially enumerated are considered without reference to their character as institutional property on which the exemption up to $150,000 in value is granted.

The use of the principal's house as his residence is no different in

principle from dormitory use. But so far as it is used for "faculty and other meetings connected with the administration of school affairs" and for the principal's official business, the use is of seminary character, and non-taxable. A division of value between the two uses should be made.

The original Academy building used as a "faculty club" would seem to be taxable. A use for social, diversional and recreational enjoyments of the teaching staff is not to be regarded as within the statutory definition of seminary use.

Alumni Hall is now "disused." It is planned to convert it into "a student and Academy publication plant, auditorium and theatre and a grill room for students desiring food outside regular meal hours." Under this plan its uses as a publication plant and auditorium will meet the test of the required seminary character. It does not appear when the building will be thus adapted. Not being in any present use, it is wholly taxable.

It is understood that the central heating plant serves buildings used exclusively for seminary purposes and buildings not thus used. The requirement of partial taxability follows, determined according to the proportion of the two uses.

The unimproved lots having no present use are also taxable.

Of the taxed properties, those entitled "Athletic and Recreational Properties" are non-taxable. Their use is exclusive and they are a part of the seminary. Their purpose to provide physical and recreational facilities for the students is on the same standing as a purpose to maintain health and treat sickness through the gymnasium and hospital.

The properties under the heading of Mixed Use are non-taxable so far as used for students' athletics and playing fields. The land used for the central heating plant follows the plant in taxability. Land occupied by buildings not taxable is also tax-exempt, while land occupied by taxable structures is to be taxed. As to unoccupied land "maintained as a part of the Academy campus and grounds," its taxability depends upon its appropriation in proportion between taxable and non-taxable buildings.

In addition, property occupied, but not exclusively used, for seminary purposes is exempt to the value of $150,000. This exemption applies to dormitories for students and residences rented for occupancy by members of the faculty. The terms of the 1913 act expressly include such property within the scope of the real estate which is thereby exempted.

The result reached dispenses with consideration of other questions presented.

*Case discharged.*

BRANCH, J., was doubtful as to the taxability of dormitories under P. L., *c.* 60, *s.* 5, otherwise he concurred; the others concurred.