## HILL vs. HILL.

1. Decree of divorce. The defence of insanity held not to have been established.

2. Depravity of character and abandoned habits, in themselves, are not evidence of insanity.

Bill for divorce. On final hearing on pleadings and proofs.

*Mr. John Hopper* and *Mr. A. B. Woodruff*, for complainant.

*Mr. S. Tuttle* and *Mr. Cortlandt Parker*, for defendant.

THE CHANCELLOR.

The bill states that the defendant committed adultery with persons unknown to the complainant, and with one Peter Brickman, in Paterson, in April, 1867, and that in June of that year she contracted venereal disease from her adulteries. The answer was put in by her father as her guardian *ad litem*, it being alleged that she was, at the time of the commission of the alleged offences, in the language of the answer, "somewhat deranged in her mind." The parties were married in 1852. The suit was begun in February, 1868, and a very large amount of testimony has been taken bearing upon the offences charged to have been committed, and the mental condition of the defendant at the time. The evidence shows satisfactorily, that in April, 1867, in the city of Paterson, she had carnal intercourse with Peter Brickman. This person was the driver of a baker's wagon, and, on a day in the last-mentioned month, stopped with his wagon at the complainant's house. The complainant's father, Smith Hill, who lived a short distance from and in sight of the complainant's house, in which the parties to this suit then lived together, testifies that on the day before the occasion just referred to, he had

seen Brickman's wagon standing at the door of the complainant's house an unusual length of time, from half to three-quarters of an hour, and that his suspicion had been excited by the circumstance. On the occasion under consideration, he was returning home in his wagon, and saw Brickman's wagon again standing at the door of the complainant's house. He quickly drove over there, a distance of from six hundred to eight hundred yards, and, hurrying into the house, found Brickman and the defendant together in a bed-room. He testifies that when he entered, Brickman was "putting his pantaloons together," or trying to button them up, while the defendant was at the foot of the bed; that he seized Brickman by the throat and took him out of the room; that the defendant followed them and begged him not to choke Brickman; that he then took Brickman in his, the witness', wagon to the witness' barn, where the complainant was at work, and that, while there, Brickman offered to pay money to settle the matter. He adds that Brickman did not state what he was doing in the complainant's house, with the defendant. The witness says there was a young man in Brickman's wagon when he saw it standing at the complainant's door on that day. Brickman, in his account of the transaction, says that he had been forbidden to leave bread at the house any more, and as he drove past on that day the defendant came running out of the house, hallooing for some bread; that he was driving slowly on, but she caught his wagon and took a loaf of bread out of the basket in the back part of the wagon, and ran into the house with it; that he stopped his horse and followed her into the house for his money, and that as he went in he did not see her in the kitchen nor in the large room, but saw her in the side room; that he went up towards that room and asked her for his money; that she was then searching the pocket of a coat there, saying she wanted to see if there was any money in Jake's (the complainant's) pocket; that while he was standing there, Smith Hill came in, and, as he came in, took hold of him, and the defendant came out of the room and went into the large room towards the table;

that Smith Hill asked him what business he had in another man's house, in the bed-room, and he told him he was waiting for his money for the loaf of bread the defendant had taken from his basket. He further says that Smith Hill was not satisfied with that, and pulled and jerked him around in the yard for a while, and then told him he must go to the complainant or he would have him arrested; and he adds that, as it was his route to go that way, he got into his own wagon and Smith Hill got into his, and they drove to the barn where the complainant was; that Smith Hill there told the latter he had caught him, Brickman, in the room in the complainant's house, and that they then let him go. There was a lad in Brickman's wagon when he stopped at the complainant's house. He remained there during the whole of the transaction. He testifies that the defendant did not come out to Brickman's wagon at all; that Brickman took bread in his hand-basket and went into the house, and that he was in there about ten minutes before the witness saw Smith Hill coming in his wagon; that when the latter and Brickman came out of the complainant's house, Hill held Brickman by the shoulder, and that they both got into Hill's wagon and drove to the barn. To say nothing of the defendant's full and circumstantial confessions to her husband, testified to by him and Mrs. Hibell, the nurse who attended her in her sickness, the proof of the carnal intercourse between her and Brickman is clear and convincing.

But the answer alleges that the defendant, for three or four years before the filing of the answer, which was in June, 1868, had been " somewhat deranged in her mind," and that her derangement had been " growing worse latterly," and that about a year before the answer was filed, the complainant, in a conversation he then had with her father on the subject of sending her to the lunatic asylum, admitted her insanity. On the hearing it was urged that because of her mental derangement at the time of the alleged offences, no decree should be made against her. A very careful consideration of the testimony has led me to the conclusion that her irresponsibility on

Hill *v.* Hill.

the ground of insanity has not been established. That her mind was weak, and that her moral perceptions were blunted, is proved. Her disposition to licentiousness was most pronounced and notorious. She was known to the police as a common prostitute, and she appears to have been unrestrained and shameless in her abandonment to the gratification of her sensuality. But, at the same time, she was discharging her household duties, and it appears in evidence that it was not until after she was grievously sick of what both of the physicians in attendance upon her (one of whom was called by her father), pronounced to be venereal disorder, that measures were spoken of, looking to her removal to a hospital or asylum. When she was committed to the asylum in 1872, more than three years and a half after the bill in this cause was filed, and about five years after she was sick with that disease, she was in confinement in jail under two indictments for adultery, and she was then sent to the asylum at the expense of the county. The adultery with Brickman was committed in April, 1867. In that year she had a venereal disease. Dr. Neer, who subsequently attended her while she was sick with that disorder, testifies that two or three months previous to November in that year she called at his office for medicine for that complaint, which she then told him she had, and that she then asked for and obtained the proper medicine, (she herself asking for the particular medicine she wanted) for the cure of her malady. She was not insane at that time. The experts who were examined in this cause on the part of the defendant, were Doctors Rogers, Moss and Buttolph. The last speaks of her as she was at the time when he was examined as a witness in this suit, which was in December, 1873, and as she had been since February, 1872, when she was admitted into the asylum. Doctors Moss and Rogers were two of the experts by whom she was examined on the inquisition taken under the statute in 1872, by direction of Judge Bedle, when she was under indictment as above mentioned. The former examined her then, but had never seen her before that time. He says " her mind was weak and imbecile, and

she did not seem to know what morality meant; providing her misdeeds were unknown, she did not seem to think it any harm." Dr. Rogers says, he first saw her in 1867 or 1868. He says his conclusion was that she was, "in a measure," insane; that she was a person of very weak mind—of a naturally weak mind. On the other hand, Dr. Neer, who treated her for her venereal disease, visited her in the jail in 1872, and was one of the experts who testified in the investigation alluded to. He says, he considered her perfectly sane. Dr. Merrill, also one of those experts, says: "I think her mind was very weak; instead of saying she was sane, I would rather say she was accountable for her acts, which I consider to be the same thing; I questioned her (referring to his interview with her in the jail,) on several topics; I found her very sharp; I would express it, not willing to commit herself until she found I knew about her, (referring to her habits of licentiousness); then she would ask me who told me; she said several times, 'I know Jake (her husband) has been telling you.'" He adds that her memory was good. It is to be borne in mind that the investigation ordered by Judge Bedle, and her consequent committal to the lunatic asylum, took place about five years after the alleged adultery with Brickman. There were two other experts examined in that investigation, Doctors Marsh and Hammond, but neither of them was called as a witness in this cause. The testimony of the witnesses who are not experts, on the subject of her insanity, is of such a character as to possess but little weight in determining the question of her mental capacity or moral responsibility. The circumstances detailed are either of but little value or significance, or admit of an explanation consistent with her accountability for her acts. That she was depraved in character, and consequently abandoned in habits, is of itself no evidence of her insanity. That she became lost to shame, and, in her lewdness, disregarded her duty to her husband and her family, is not proof of an unsound mind, but of vicious tastes and inclinations too powerful to be controlled by the demands of duty or the restraints of society. Her mental condition in

1872, might well have been the result of her long-continued sensual indulgence.

The complainant is entitled to a decree of divorce.