Raymond D. Bailey, petitioner-respondent,

*v.*

May Bailey, defendant-appellant.

[Decided April 12th, 1934.]

On appeal from a decree of the court of chancery advised by Advisory Master Grosman, who filed the following opinion:

"The petitioner sues for divorce on the ground of adultery. The defendant denies the charge and counter-claims for separate maintenance. The facts are these: The parties were married on the 3d of October, 1931. The defendant was previously married for some seventeen years to one William Wise, whom she divorced some short time prior to her marriage to the petitioner in this case. The petitioner is a Protestant; the defendant is a Catholic. They were married by a minister of the Dutch Reformed Church. For some six months after their marriage they lived together in contentment. About this time the petitioner's salary was reduced. The defendant became sullen and disagreeable. She stated that she was not getting what she expected in a financial way out of her marriage. About this time she also displayed a college alumni publication wherein the name of her

first husband was mentioned as having been promoted or occupying an engineering position which netted him $18,000 a year. Her husband's salary had originally been some $7,000 a year and was gradually scaled down through reductions to $4,800 a year. The defendant in commenting upon her former husband's $18,000 income remarked: 'Look what I lost out on.' She told the petitioner's sister and also a maid employed in her home that she was going to leave her husband. About this time she also took counsel with her family, all of whom are of the Catholic persuasion, and she was advised that in the eyes of her church she was still the wife of her first husband. She herself came to this conclusion and so informed the petitioner. Sometime prior to the 14th day of November, 1932, she commenced packing her personal belongings which she brought to the family homestead, namely, silverware, linens, pictures and furniture. On the 14th day of November she had all of these items and also a grand piano moved to the home of her former husband, the co-respondent herein, at No. 308 Knickerbocker road, Tenafly, New Jersey. She summoned the expressman who moved the furniture. She remained at the home of her former husband from the 14th to approximately the 18th day of November, 1932, and occupied her former quarters in the house. Her former husband lived in the house with her during this period though he denies that he had any sexual relations with her. He is an engineer by profession and a man of more than average intelligence. He testifies that he was very much surprised upon returning home on the night of November 14th to find his former wife there; that for three hours he talked to her and tried to persuade her to leave and return to her husband. This she refused to do. Apparently the defendant won him over to her point of view because he permitted her to remain in the house over night and stayed there with her. This situation continued until the morning of the 18th of November when the defendant was taken by a young lady to her family in Yonkers, New York. The co-respondent makes no satisfactory explanation of his conduct in not only having permitted the defendant to

remain at his house during this period but in having shared living quarters with her. The testimony is that in the afternoon of the 17th one of the witnesses called upon the defendant at the home of the co-respondent. She found her in a highly nervous condition reclining upon a couch covered with blankets and that the defendant requested the witness, Mrs. Amale Lovatt, to procure some luminol for her. This she did; that she remained with her for sometime and then left. That the next morning she again called upon the defendant at the same place and found that she was extremely nervous and upset and took her to an establishment maintained by the witness from which the defendant made a telephone call to the petitioner. The conversation seems to have greatly excited the defendant. The witness then undertook to call the petitioner and spoke to him. She states that she requested him to call for the defendant as she did not know what to do with her. The petitioner advised her to call the defendant's relatives. This she did and thereafter took her to the home of the defendant's sister in Yonkers, New York, at which time the defendant was still nervous and hysterical. Thereafter the defendant was taken to a hospital in Summit, New Jersey, later removed to Dr. Doughtery's Sanitarium at Yonkers, New York, where she was confined for some three weeks. It is most significant that the co-respondent took the defendant from Dr. Doughtery's Sanitarium to his home in Tenafly, New Jersey. He offers no satisfactory explanation for his conduct in so doing. Some few days later, the defendant, accompanied by her brother, voluntarily had herself admitted as a patient at the Greystone Park Hospital for Mental Diseases at Morris Plains, New Jersey. Here she remained for several months and was then discharged as recovered. There is no dispute about the facts in this case. The defendant did not take the stand on her own behalf. The explanation was made by counsel and by her sister that on the day of the trial she was extremely nervous and confined to her bed. No medical testimony was offered to show what her condition happened to be at this time. The defense offered for the defendant's

conduct is that she was suffering from the effects of an overdose of luminol, a sedative drug, and that she was mentally irresponsible for her conduct at the time that she returned to her former husband. The evidence does not bear this out. The defendant appears to have been thoroughly calm and collected during the period preceding the 14th of November when she removed her personal belongings and returned to her former home. There was nothing irrational about her statements to the petitioner's sister that she intended to leave her husband; that she was not getting what she expected in a financial way out of her marriage and her chagrin at having divorced a man who subsequently had been promoted to a position paying $18,000 a year and married one whose salary of $7,000 was being gradually reduced, is not inconsistent with sanity. For some days prior to her leaving she went about the business of packing her belongings. She told her maid that she was leaving her husband. She told her husband that her religious scruples did not permit her to continue her relationship longer because in the eyes of her church she was still the wife of William Wise and that her relationship with the petitioner was sinful. She made all arrangements for the removal of her belongings. Her actions up to this point were logical and consistent with her avowed purpose to return to her former husband. I am of the opinion that her hysteria is traceable to the time when her former husband advised her that he was not willing to resume his former relations with her and accept her as his wife. There can be no doubt as to the existence of an inclination on the part of the defendant and her former husband to commit adultery. They had been married for seventeen years. Ties of such standing are not easily broken. The testimony discloses that even prior to the time when the defendant left the petitioner she had on at least two occasions met her former husband in New York City by appointment. On one occasion he took her to dinner and on another occasion they met at a football game. These meetings, of course, were without the knowledge of the petitioner. On the 14th of November, 1932, when the co-respondent returned home

and found the defendant established in her former quarters, he could have summarily had her ousted. If for sentimental reasons he did not desire to resort to such methods, he could have notified her relatives or her husband with whom he was well acquainted, they having been classmates at college, to call for the defendant and take her away. Failing all this, he himself could have withdrawn from the house and spent the night elsewhere. Instead of doing any of these things, he permitted the defendant to remain in his home and stayed there with her alone. Furthermore, the co-respondent had a charwoman in his employ who was in the habit of coming to the house on Friday afternoons. During the time that the defendant sojourned at her former husband's home, the co-respondent notified the charwoman not to come that Friday. After the defendant's removal to Dr. Dougherty's Sanitarium, the petitioner's New York counsel sent for the co-respondent and told him that the petitioner intended to sue the defendant for divorce on the ground of adultery and name him as co-respondent. Knowing this, the co-respondent nevertheless sometime later went to Dr. Dougherty's Sanitarium and took the defendant back to his home. There may be some satisfactory explanation for the co-respondent's conduct, but if so it has not been presented to me.

"Counsel intimates that perhaps the defendant was insane in November, 1932, when she is charged with having committed the acts complained of. If in fact the defendant was insane during the period from November 14th, 1932, on, she cannot be held accountable for her conduct. This fact, however, has not been established before me. True the co-respondent states that the defendant was highly nervous on the night of November 14th when he found her in his home and the witness Mrs. Amale Lovatt states that on the afternoon of November 17th, when she procured the luminol for her, she was very nervous and on the morning of November 18th she was in a highly nervous condition and that after she attempted to speak over the telephone to the petitioner, she became hysterical, but this, of course, falls far short of

amounting to insanity. There is no proof before me whatsoever that the defendant was so bereft of her reason during this period that she was unable to distinguish the nature of her conduct. I am of the opinion that her nervousness and hysteria were the result of her conduct and not that her conduct was the result of any mental disorder. The probability is that she became nervous and hysterical when she realized that the co-respondent was unwilling to accept her as his wife and that she had hopelessly involved herself in a scandalous situation. Lest there be any doubt as to the defendant's present mental condition, upon the urgent insistment of counsel, I have agreed to withhold my conclusions until the result of an examination of the defendant by Dr. Dowd, an eminent specialist in mental diseases, is available. If thereupon it should appear that the defendant is presently insane, I will have a guardian appointed for her, otherwise I will dispose of the matter forthwith. Upon the facts as now established before me, I am constrained to find that the defendant is guilty of the adultery charged against her in the petition and that the counter-claim should be dismissed. I will advise a decree in accordance with these findings.

"Since the preparation of this memorandum I have received the report of Dr. Ambrose F. Dowd, a psychiatrist employed by the defendant's counsel to advise him as to his client's mental condition. He reports that the defendant is not insane at this time nor in his opinion has she ever been, but that she is emotionally disturbed and suffering from psychoneurosis which I take it to be nothing more than extreme nervousness. My view is that nothing short of insanity so pronounced that the defendant is unable to appreciate the nature of her conduct, will suffice to excuse adultery. It does not appear that the defendant was ever bereft of her reason to the extent of placing her in this category. I will consequently adhere to my original determination and find that the adultery charged against the defendant has been established and will advise a decree divorcing the parties from the bonds of matrimony and dismissing the defendant's counter-claim."

*Mr. James J. Major,* for the appellant.

*Mr. Saul J. Zucker (Mr. Jacob L. Newman* and *Mr. Lionel P. Kristeller,* on the brief), for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons expressed in the opinion of Advisory Master Grosman, delivered in the court of chancery.

*For reversal*—None.