## Schwarzkopf, Appellant, *v.* Schwarzkopf.

Argued April 12, 1954. Before HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE and ERVIN, JJ. (RHODES, P. J., absent).

John N. *Gazetos,* with him *Armand R. Cingolani,* for appellant.

*Luther C. Braham,* with him *Darrell L. Gregg* and *Galbreath, Braham & Gregg,* for appellee.

OPINION BY WOODSIDE, J., August 30, 1954:

This is a divorce case in which the Master recommended the granting of a divorce a.v.m. to the husband on the ground of indignities, but the court refused to approve the report and to grant the divorce.

The parties were both 50 years of age at the time of the hearing. They have been married since 1924. Their only child died at the age of 24 in May 1951. Both are college graduates. The marriage was not a happy one, but our examination of the record convinces us that the plaintiff has not made out a case.

The appellant contends that the wife frequently objected to sexual relations and lacked the ardor he desired. But refusal to have sexual intercourse is not sufficient ground for a divorce. *McCommons, Jr. v. McCommons,* 85 Pa. Superior Ct. 323 (1925) ; *Rausch v. Rausch,* 146 Pa. Superior Ct. 342, 22 A. 2d 221 (1941). It does not constitute such indignity to the person as warrants granting a divorce. *Taylor v. Taylor,* 142 Pa. Superior Ct. 441, 16 A. 2d 651 (1940) ; *James v. James,* 126 Pa. Superior Ct. 479, 191 A. 191 (1937).

The weakness of appellant's argument can best be measured by quoting from his testimony: "We were married after school on Friday . . . and Friday night in Cleveland she was very reluctant to enter into any relationship with me but finally did . . . and again [the

next night] it was the same thing as far as her reluctance was concerned, although she did allow it . . . the reluctance continued throughout our marriage . . . she would accept any loving or kissing or endearments up to the point where intimate relationship and then she would resist most of the time. . . . After the daughter was born she said she decided she wanted another child, a boy, and even after deciding that, our relationship didn't change very much other than trying to conceive . . . there was a miscarriage . . . she was about the same as before . . . she said I wasn't fit to be a father and she wouldn't under any circumstances have any more children by me . . . refused any relationship till I got so indignant and aggressive she would consent occasionally . . . There wasn't much use [of trying to correct matters] as far as the sexual relations after she said I wasn't a fit father. In fact most of my love for her had gone by that time. Ever since then I felt it was my duty to keep the home going for my daughter's sake."

He said his wife was jealous. "When I was working . . . she would check at the mill . . . call the main gate . . . this was embarrassing . . . but as far as any scenes, I don't recall of any . . . The jealousy after [social] gatherings was always there and the nagging . . . digs and insinuations would always be there afterwards . . . I tried to avoid any appearance of even friendliness to any of the women . . . The embarrassment never came from her mentioning anything but more from looks. If anything would happen that would displease her, I could tell the way she was looking and acting. It wasn't probably apparent to anybody there but after the party was over she would nag me."

He complained that his wife's conduct prevented him from fully discharging his social obligations to his friends and business associates and in no way helped

him to improve his position. The testimony concerning this and her social life generally gave even less support to the finding of an indignity than the other matters discussed.

The wife entered Torrance State Hospital in June 1943, for mental treatment and remained there until August 1944. In January 1950, she was committed to Torrance State Hospital again, and has remained there ever since.

The plaintiff testified that with the exception of the two times defendant was in the hospital, and a short while prior thereto, in each instant she was mentally normal.

In *Fawcett v. Fawcett*, 159 Pa. Superior Ct. 185, 187, 48 A. 2d 23 (1946), this court said: "Nothing is better established in our law than that ill health both explains and excuses a wife's conduct, and that the acts of a spouse resulting from ill health do not furnish a ground for divorce."

In *Stewart v. Stewart*, 171 Pa. Superior Ct. 218, 221, 90 A. 2d 402 (1952), this court said: "conduct which springs from mental ill-health, whatever its nature or severity, should be regarded as unintentional and lacking the spirit of hate, estrangement, and malevolence, which is the heart of the charge of indignities."

The lower court here noted that "the conduct of the defendant complained of may well have been the result of mental ill-health." This, of course, is an element to be considered.

Apparently everyone connected in any way with this case has overlooked §53 of The Divorce Law of May 2, 1929, P. L. 1237, 23 PS §53. No reference was made to it or its provisions anywhere in this case.

It provides as follows:

"Upon the hearing of any case before the court, a master or jury, where the petition or libel sets forth

that the respondent is a lunatic, the question of lunacy shall be fully established by expert testimony, together with every other matter of fact that is affirmed by one party and denied by the other. No divorce shall be granted to the libellant, in any such case, unless it be proved beyond a reasonable doubt that the respondent is hopelessly insane, but, if any respondent has been for ten or more years an inmate of any asylum for the insane, it shall be conclusive proof of hopeless insanity."

The defendant not having been an inmate of an "asylum for the insane" for ten years or more, it was necessary for the plaintiff to fully establish by expert testimony the question of lunacy and to prove beyond a reasonable doubt that the defendant is hopelessly insane. There was no "expert testimony" in this case concerning the mental status of the defendant. There was hearsay testimony in the record that the doctors "said she could not be cured." Under no circumstances could there be a finding that she was "hopelessly insane" based on such testimony.

It is to be noted that not only must the question of lunacy be established by "expert testimony," but that her insanity is hopeless must be "proved beyond a reasonable doubt." No effort having been made to prove this, under the aforesaid statutory provision no divorce could be granted.

If this were the only matter standing in the way of the plaintiff's obtaining a divorce we would return the case so that he might submit such evidence on the question of his wife's mental condition as may be available to him, but having already had two hearings during which he failed to submit sufficient evidence to prove indignities on the part of his wife, no useful purpose would be served by remanding the case.

The matter of service of the defendant and her rep-

resentation, or rather lack of it, before the Master are matters which give us concern.

The record shows that service in this case was made on the trust officer of the Butler Savings and Trust Co., "Guardian of Thelma M. Schwartzkopf." A master was appointed and a hearing held at which the wife was not present and not represented. After the master filed his report the court quite properly sent the case back to him (although the only record of this happening is in the supplemental report of the master). At the second hearing plaintiff's attorney called the trust officer of the defendant's guardian who testified that the Butler Savings and Trust Company was appointed guardian for Mrs. Schwarzkopf at Ms. D. No. 16 September Term, 1952; that he contacted Mrs. Schwarzkopf's parents about the divorce and received an answer November 21, 1952 (a few days before the first hearing) in which her father said he had no objections to Mr. Schwarzkopf's action, "but expressed some concern as to her future care and maintenance." Assuming this information was admissible, the letters were the best evidence,—or at least better than the testimony,—but they were not exhibited or admitted, the witness testifying "they are part of the file of her guardianship and I would like to keep them, but they can be available at any time."

The plaintiff introduced a letter from defendant's parents to him in which they said inter alia "As to your getting a divorce, it seems the only solution, even tho we doubt if Thelma would want it."

Upon appeal to this court the attorneys for the trust company, apparently somewhat reluctantly, but under the circumstances quite properly, appeared and argued the case, on the part of the appellee.

It did not appear from the record whether the trust company was guardian of the person or guardian of

the estate, but from counsel for the trust company we learn that it is guardian of the estate. It also appears that within a few weeks, possibly within a few days, the wife was committed to the hospital, the guardian of her estate was appointed and the divorce action started.

In 1951 the Legislature passed The Mental Health Act of June 12, 1951, P. L. 533, and the Incompetents' Estate Act of June 28, 1951, P. L. 612.

Section 901 of The Mental Health Act of 1951, 50 PS §1541, provides for the appointment of "a guardian of the person" for one mentally ill "in the interest of his safety and well-being."

Section 301 of the Incompetents' Estate Act of 1951, 50 PS §1681 provides that when a person is mentally ill the court may appoint "a guardian or guardians of his estate." Section 401, 50 PS §1781 gives "The guardian of the estate of an incompetent . . . the right to maintain or defend any action with respect to such real or personal property of the incompetent."

Section 102 (4), 50 PS §1632, defines a guardian as follows: " 'Guardian' means a fiduciary appointed by a court of competent jurisdiction to have the care and management of the estate of an incompetent. It includes committees and guardians heretofore appointed for incompetents."

As early as 1836 there were committees of the estate of "lunatics" and committees of the person and writs could be served upon either. Act of June 13, 1836, P. L. 589 (repealed).

The Act of May 28, 1907, P. L. 292 (repealed) provided for the appointment of "a guardian for the estate" of an insane person.

The Act of April 18, 1905, P. L. 211 (repealed) provided that in a divorce proceeding against a "hopeless lunatic or non compos mentis," service could be

made upon the committee of such lunatic." A somewhat similar provision was contained in §30 of The Divorce Law of May 2, 1929, P. L. 1237, as amended by the Act of May 18, 1937, P. L. 719.

In *Collins v. Collins,* 86 Pa. Superior Ct. 43 (1926) this court held that service upon a guardian of the estate appointed under the Act of 1907 was not a legal service. It was pointed out that the powers of the guardian appointed under the Act of 1907 extend only to the custody of the property of such person. The court said, p. 46 "The two offices, committee of lunatics and guardian of weak-minded persons are distinct and so recognized by law."

Rule of Civil Procedure 2055 adopted June 2, 1941 provides: "When an incompetent is a defendant, original process may be served on him . . ., or may be served on his guardian appointed by a court of competent jurisdiction within this Commonwealth."

In *Smith v. Smith,* 56 D. & C. 279 (1946) Judge RICE of Perry County held that section 30 of the Divorce Law of 1929, supra, was so inconsistent with Rule 2055, supra, that it was suspended. He concluded that service upon a guardian ad litem appointed by him was improper. "Guardian" he pointed out was defined by Rule 2051 as meaning "the guardian, committee or other fiduciary appointed by a court of competent jurisdiction for the person or estate of an habitual drunkard, a weak-minded person or a person of unsound mind." See also *Sassaman v. Sassaman,* 80 D. & C. 501, 43 Berks 239 (1951).

The guardian in this case apparently having been appointed under the Incompetents' *Estate* Act as a guardian of defendant's *estate* with statutory authority to "defend any action *with respect to such real or personal property* of the incompetent," was quite understandably confused as to what its duty was in a

divorce action against the incompetent for whose *estate* it was appointed guardian. (Emphasis ours)

We need not pass upon the legality of the service in this case, but we think that the question of service of a divorce action upon an incompetent should receive the prompt and careful consideration of the Procedural Rules Committee. They should give attention to the 1951 acts passed after their rules were adopted and the distinction these acts make between a guardian of the person and a guardian of the estate of an incompetent, and the ruling of this court in *Collins v. Collins,* supra. They should also consider the holdings of several of the lower courts that service upon a guardian ad litem is not legal service, and that the Rules of Civil Procedure suspended §30 of The Divorce Law of 1929 as amended.

Service in this case could have been made upon the incompetent herself (See Pa. R. C. P. 2055).

In the case before us the defendant had no representation before the Master. Even when an incompetent defendant is represented, the plaintiff has an advantage over his spouse that he does not have when as a competent person she can appear and explain or deny the accusations made against her.

Our practice cannot be so lacking in its protection of the helpless that no duty is imposed upon those conducting the case to see that she is adequately represented and her rights protected not only in theory but in fact. In this connection see Procedural Rule 2053(b).

Even had the plaintiff made out a good case of indignities and met the burden imposed upon him by §53 of The Divorce Law, supra, nevertheless, we would have remanded the case so that the defendant could have been properly and adequately represented before the master and the court below.

Order refusing divorce affirmed.