Manley *v.* Manley, Appellant.

Argued March 23, 1960. Before RHODES, P. J., GUNTHER, WRIGHT, WOODSIDE, ERVIN, WATKINS, and MONTGOMERY, JJ.

*Charles F. Mayer,* for appellant.

*John B. H. Donaldson,* with him *Lippincott & Donaldson,* for appellee.

OPINION BY WOODSIDE, J., September 20, 1960:

This appeal was taken by the wife-defendant from a final decree granting the appellee a divorce a.v.m., upon the ground of adultery.

The plaintiff-appellee brought the action on the ground of indignities. Subsequently, by leave of court, he amended his complaint alleging that the defendant had committed adultery between May 21 and June 8, 1958.

The master recommended that a divorce be granted on both grounds. The court below concluded that the indignities committed by the wife should be excused on the ground that she was mentally ill, but entered a decree granting the divorce on the ground of adultery.

We must examine for ourselves the testimony in divorce cases heard without a jury and determine therefrom, independently of the findings of the master, or even the court below, whether in truth and in fact a legal cause of divorce has been made out. Of course, the master's report, although advisory only, is to be given the fullest consideration as regards the credibility of witnesses whom he has seen and heard. *Boyer v. Boyer,* 183 Pa. Superior Ct. 260, 263, 130 A. 2d 265 (1957) ; *Rech v. Rech,* 176 Pa. Superior Ct. 401, 403, 107 A. 2d 601 (1954).

The plaintiff is vice-president of the Associated Hospital Service of Philadelphia (Blue Cross). The master reported that he "was responsive to questioning and appeared entirely candid, and although under obvious mental strain he was essentially composed and direct in his testimony . . . Mild in manner . . . there was at no time any conscious effort to deceive or misrepresent . . . [he was] in all respects fully credible." By contrast the master found the defendant "a belligerent and aggressive individual, dynamic and self-assertive, argumentative and contentious . . . her testimony was biased and discolored and her recollections many times were faulty."

An examination of the record convinces us that the defendant was guilty of adultery with Donald Wilson,

who is the co-respondent named in this case. She has long been enamored of him. He sent her numerous endearing notes and greetings. She testified, "I was in love with him. I still am, and he is with me, and that's that." At the hearing, when she was shown the endearing notes and greetings, she said, "A shame you couldn't have gotten some of my notes to him." She admitted to the plaintiff that she had an "affair" with Wilson, and on numerous occasions told her husband that he was not the father of her youngest child. Between the time the parties separated in October of 1958, and the time of the hearings, Wilson had been at the defendant's residence almost continuously. The telephone in the defendant's home is listed in both her name and Wilson's name. The two of them were arrested together several times for disorderly conduct. Wilson frequently spent all night at the defendant's home, where they were alone except for small children.

The plaintiff charges the defendant with adultery from May 21 to June 8, 1958. There is evidence from which it can be inferred that on 14 different dates within that period Wilson stayed over night at the defendant's home. The defendant admits that he has been at her home practically every night since the plaintiff left and that he has stayed over night at least five or six times. Wilson was present at several hearings but did not testify.

We concur with the conclusion of the master and the court below that this evidence, in the language of the Supreme Court, "would lead the guarded discretion of a reasonable and just man to a conclusion of guilt." *Matchin v. Matchin,* 6 Pa. 332 (1847).

The parties were married in 1940, and lived together until September or October of 1957. There are four children of the marriage, three living with the mother and the oldest (16 years old at the time of the hearing)

living with the father. Immediately after their marriage, the parties lived normally, but when the plaintiff returned from the service in 1945, he noticed his wife was cool to him. In 1949 she began drinking heavily, and staying away from home more and more frequently and later and later at night—sometimes all night. This was the year she gave in her testimony as the one in which she fell in love with Wilson.

We shall not detail the conduct which the master found sufficient to warrant the granting of a divorce on the ground of indignities, but as some of the testimony bears upon the defendant's mental condition and the adultery, as well as the issue of indignities, it becomes necessary to refer to some of it. There can be no question that she made the plaintiff's life burdensome, and that since falling in love with Wilson, she has not hid her hate for her husband.

After 1949 the defendant's drinking, and with it her conduct, grew progressively worse. Her actions brought her numerous encounters with the police, and at least five times she was charged with disorderly conduct.

In 1953 she received medical and psychiatric treatment from two physicians and at the Pennsylvania Institute as an out patient and subsequently, for a period of a month, in the Pennsylvania Hospital. Thereafter, she drank less, but used alternately sleeping pills and benzedrine in great quantities.

One time, while in jail on a disorderly conduct charge, she took seven sleeping pills. She testified that she did this so she would be taken to the hospital where she could make a telephone call which she hoped would obtain her release from jail. She said that she previously had taken a full bottle of sleeping pills so she knew that seven pills would not kill her. She was taken to the Chester Hospital where Dr. Samuel Ivins was

in charge of her case. He thought she was mentally ill at that time, and signed papers for her commitment to Embreeville State Hospital where she was committed by order of court. She was at Embreeville from March 1 until May 30, 1955, when she was discharged after a letter from the hospital to the court stating that she had made a satisfactory adjustment, that she was friendly, cooperative and had expressed a desire to continue treatment, and that she desired admission to the Pennsylvania Hospital. She was discharged in the custody of her husband for one year. She went to the Pennsylvania Hospital for a few weeks and then returned home. Since that time she has received no psychiatric treatment, but has continued to operate her home, socialize with her friends, care for her children, love her paramour, and hate her husband.

The defendant's counsel called as a witness Dr. Eleanor R. Wright, a psychiatrist, who never examined the defendant—never even saw her. Dr. Wright brought the records of the Embreeville State Hospital, but refused, under instructions from her superiors, to permit the master or counsel to examine them. She was not connected with the hospital when the records were made. She read from them that the diagnoses of the defendant's condition was first "sociopathic personal trait disturbance, anti-social reaction," and later "schizophrenic reaction, paranoid type." The latter diagnosis was made at approximately the same time the above letter was sent to the court upon which the court discharged the defendant from the hospital.

Dr. Wright, testifying at the time as an expert, said, "Schizophrenic reaction, paranoid type" is a very general term, and can be from a very severe to a very mild condition. She gathered from the record that the condition of the defendant would be classified as mild.

Dr. Samuel Ivins, also a psychiatrist, was called by counsel for the defendant as an expert. The *defendant,* who had been absent during Dr. Wright's testimony, appeared while Dr. Ivins was testifying and later she repeatedly and emphatically objected to the suggestion that she had a mental illness.[1] Dr. Ivins testified that he saw the defendant three times while she was in the Chester Hospital in 1955. He also testified that he was one of the doctors who signed the court commitment papers, and that at that time he "felt that she was mentally ill." He never saw her after she left the Chester Hospital until she walked into the hearing while he was testifying. Asked whether one with schizophrenic reaction, paranoid type could be cured in a period of three or four months without further treatment, he said, "The answer is: probably no." He said his records did not show a diagnosis of schizophrenia. He said, that "like T.B.," schizophrenic, paranoid type could be arrested "but you are an arrested case for the rest of your life." But, he also testified that a person diagnosed as schizophrenic, paranoid type might be cured without receiving treatment. He also said "generally speaking", a schizophrenic, paranoid type, does not know the difference between right and wrong.[2]

---

[1] This raises an interesting question concerning the duty of counsel to his client and the court. In defending a divorce action should counsel raise any defense contrary to the desire of his client? If counsel thought his client was incompetent at that time, he should not have proceeded with the case until a guardian was appointed. See Pa. R. C. P. 2056(c) (d).

[2] Who does? Judges, lawyers, theologians, philosophers, sociologists, even psychiatrists differ widely on what is right and what is wrong. Who is to say who is right about what is right? Without knowing what is right and what is wrong, who can be said to know the difference? But the law does have a standard of sanity, known as the "right and wrong test." It is based upon the ability to distinguish between right and wrong.

With the exception of saying he thought the defendant was "mentally ill" when he examined her in 1955, he expressed no opinion concerning the mental condition of the defendant.

Because Dr. Wright had no personal knowledge of the facts concerning the defendant's hospitalization at Embreeville, and was testifying from records which she refused to exhibit to the master and counsel, the master sustained objections to the admission of that which was read from the hospital records. However, by agreement of counsel, it was recorded subject to the objection. Practically all of the testimony of Dr. Ivins is based upon the hospital record which was never produced except through Dr. Wright's testimony. Thus, most of the medical testimony was inadmissible and much of it, although recorded, is not even a part of the record. But, accepting all that is recorded, whether or not admitted or admissible, it is insufficient to establish that the defendant was legally insane when she committed adultery.

The master made no reference to the defendant's mental condition in his report. Probably, he either felt there was not sufficient evidence admitted into the record to sustain a finding of mental illness, or he did not consider that evidence which was admitted to be credible.

However, to the court below the evidence indicated that the indignities were caused by mental ill health, although it could not "determine from the state of the record just when the mental illness was shut off or turned on." Thus, it would appear that the court did not believe all the indignities were caused by mental illness, but because it could not determine which indignities were caused by mental illness and which were not, it concluded that the defendant should be excused from all of them. If some indignities were legally ex-

cusable and others were not, was not the burden upon the defendant to show the ones for which she was not legally responsible? We need not pass upon this, as we are disposing of the case on the adultery charge.

In doing so, we are faced with two questions: (1) Is insanity a defense to a charge of adultery brought against the wife in a divorce case? (2) If it is, does the evidence in this case establish a mental condition at the time of the defendant's adultery which would relieve her from legal responsibility for her acts?

Chief Justice JOHN BANNISTER GIBSON said in *Matchin v. Matchin,* 6 Pa. 332 (1847) that a wife's insanity is not a defense to an action against her for divorce on the ground of adultery. This has been recognized as the law of this Commonwealth ever since. There are numerous authorities within and without this Commonwealth which have referred to this as the rule of law in Pennsylvania: *Gilham v. Gilham,* 177 Pa. Superior Ct. 328, 333, 334, 110 A. 2d 915 (1955); *Baughman v. Baughman,* 34 Pa. Superior Ct. 271, 273 (1907); *Hadley v. Hadley,* 144 Me. 127, 65 A. 2d 8, 9 (1949); *Laudo v. Laudo,* 177 N.Y.S. 396, 397, 398 (1919); 19 A.L.R. 2d 176 and numerous cases there cited. 27A C.J.S. Divorce, §55 (note 37).

Furthermore, the legislature in setting forth the defenses to an action for divorce in section 52 of the Divorce Code of May 2, 1929, P. L. 1237, 23 P.S. §52 omitted insanity as a defense. This Court said in *Berezin v. Berezin,* 186 Pa. Superior Ct. 340, 346, 142 A. 2d 741 (1958), "Our review of the cases leads us to the conclusion that the only defenses available against a charge of adultery in a divorce case are those expressly enumerated in Section 52."

The rule and its basis is set forth in *Matchin v. Matchin,* supra, 6 Pa. 332, 336, 337 (1847), by Chief Justice GIBSON as follows: "But a wife's insanity,

though so absolute as to have effaced from her mind the first lines of conjugal duty, would not be a defence to a libel for adultery, though it would be a defence to an indictment for it. The offence is a social, as well as a moral one; and it is agreed by the civilians to be less grievous to the sufferer, though not less immoral, when it is committed by the husband, whose transgression can not impose a supposititious offspring on the wife, than it is when committed by the wife, whose transgression may impose such an offspring on the husband . . . but the primary intent of [divorce] is undoubtedly to keep the sources of generation pure, and when they have been corrupted, the preventive remedy is to be applied without regard to the moral responsibility of the subject of it . . . insanity *might* be a bar to divorce at the suit of the wife, when it would not, in similar circumstances, be a bar to divorce at the suit of the husband. To say the least, adultery committed under the irresistible impulse of that morbid activity of the sexual propensity which is called *nymphomania,* or more recently, *erotic mania,* would certainly be ground of divorce . . . The great end of matrimony is not the comfort and convenience of the immediate parties, though these are necessarily embarked in it; but the procreation of a progeny having a legal title to maintenance by the father; . . ."

The rule has been severely criticized by the courts of other jurisdictions and those who have written on the subject of divorce. "It would seem to be self-evident that insanity of the guilty party at the time of the commission of adultery is a defense to a suit for divorce based upon the wrong" say the Messrs. Freedman, §210 Law of Marriage and Divorce. "We are surprised that such an opinion should ever have found admission into the reports." said the Supreme Court of Vermont in *Nichols v. Nichols,* 31 Vt. 328, 332 (1858). "Wholly

inconsistent with the necessities arising from social conditions . . . The principles of the Matchin case would require a court to grant a decree of divorce to a husband whose wife had been the victim of a rape. I am unable to conceive how any court can properly give sanction to the views expressed . . ." said a New Jersey Court in *Kretz v. Kretz*, 73 N. J. Eq. 246, 247, 67 A. 378 (1907). "It would entitle the husband to a divorce, if the wife should become unfruitful from disease, or if another man should gain access to her by force or fraud," said the Alabama Supreme Court in *Wray v. Wray*, 19 Ala. 522, 525 (1851).

The appellant contends that the point under discussion is a question of first impression in this Commonwealth. Following a contention made by Freedman in §210 of Law of Marriage and Divorce in Pennsylvania (2d Ed.), it is argued that the statement of Chief Justice GIBSON in *Matchin v. Matchin,* supra, on insanity as a defense to divorce is dictum because the defendant in that case was not insane.

The majority of this Court does not understand this to be dictum.[3] We are of the opinion, however, that

---

[3] The Supreme Court's opinion in the *Matchin* case starts with: "Though we are bound to determine this appeal on the depositions sent up with the record, they contain enough to warrant a concurrence in the general belief that the appellant was actually insane." The court also says of the defendant: ". . . this dulness of the moral sense seems to have been a defect in the constitution of her mind." With the exception of a single sentence, the entire opinion is devoted to the determination of whether insanity was a defense and whether the evidence was sufficient to find that the defendant committed adultery. That one sentence (somewhat contradictory to what is quoted above), which leads the minority of our Court to the conclusion that the stated rule on insanity is dictum, is: "So far I have treated the subject as if the evidence made out a case of moral insanity, though, in point of legal effect, it does not." It is interesting to note that the year before writing this, Chief Justice

we should not blindly follow a rule which has failed to withstand the light of judicial and scholarly examination. If there was any reason for the rule in the light of the customs and thoughts of 1847, it is no longer evident in the light of 1960 thinking.

As the rule was pronounced by the Supreme Court and left unchanged by the legislature, we ordinarily could do nothing about it, for we are required to follow the pronouncements of our highest Court. See §10 Act of June 24, 1895, P. L. 212, 17 P.S. §198. However, this Court has had jurisdiction over divorce appeals for 65 years, and as far as we have been able to deter-

---

GIBSON had equated "moral insanity" to what is now known as the irresistible impulse theory and "legal insanity" to the so-called "right and wrong test." *Commonwealth v. Mosler*, supra, 4 Pa. 264 (1846).

As the majority views it, Chief Justice GIBSON believed that the defendant suffered a "defect in the constitution of her mind" or "a general belief that the appellant was actually insane," and disposed of the *Matchin* case on the ground that insanity was not a defense regardless of its degree. That he followed this conclusion by saying "in point of legal effect," the evidence did not make out a case of insanity, is the mere expression of a second reason why the defense would not be sustained in that case. Where a decision rests on two or more grounds, none can be relegated to the category of "obiter dictum." *Woods v. Interstate Realty Co.*, 69 S. Ct. 1235, 1237, 337 U. S. 535, 93 L. Ed. 1524 (1949). Nor is a decision of the court on a certain point dictum, merely because something else was found in the end which disposed of the whole matter. *Florida Cent. R. Co. v. Schutte*, 103 U. S. 118, 143, 26 L. Ed. 327 (1880). The fact that the same result may be reached by either of two rulings of a court does not make either "dictum". *Trustees of Phillips Exeter Academy v. Exeter*, 27 A. 2d 569, 577, 90 N.H. 472 (1940). See also *Commonwealth v. Almeida*, 362 Pa. 596, 603, 68 A. 2d 595 (1949).

A great number of cases and digests written during a period of over 100 years refer to *Matchin v. Matchin* as "holding" or "deciding" that insanity is no defense to adultery by the wife in an action for divorce.

mine, during this time the Supreme Court has made no reference in any divorce case to the rule on insanity stated in the *Matchin* case. The rule was pronounced many years ago, and there is authority for our ignoring an ancient higher court rule which is unreasonable and unjust by all known standards, and which has frequently been examined and universally rejected by legal authorities and by courts in other jurisdictions. See *Commonwealth v. Franklin*, 172 Pa. Superior Ct. 152, 92 A. 2d 272 (1952).

We shall not follow the rule. We believe the gist of the offense of adultery is not the possibility of illegitimate children but the unfaithfulness to the marriage vow, and, if the wife does not voluntarily indulge in sexual intercourse with a person other than her husband but it occurs rather by force, fraud, or by advantage of her insanity, she cannot be said to be guilty of any violation of her marital obligation.

Therefore, in our opinion, insanity is a defense to an action for divorce brought against a wife on the ground of adultery if it affirmatively appears from all of the evidence that at the time the defendant committed adultery she did not know the nature and consequences of her acts, or have the ability to distinguish between right and wrong.

This is the test that has been applied in criminal cases in Pennsylvania and is the test most frequently applied by other states which recognize insanity as a defense to adultery in a divorce case. *Commonwealth v. Lockard*, 325 Pa. 56, 60, 188 A. 755 (1937); *Hill v. Hill*, 27 N. J. Eq. 214 (1876); *Bailey v. Bailey*, 115 N. J. Eq. 565, 171 A. 797 (1934); *Hadley v. Hadley*, 65 A. 2d 8, 10 (1949); *Laudo v. Laudo*, 177 N. Y. S. 396 (1919).

In Pennsylvania we have rejected the "irresistible impulse" test as a legal excuse for the misconduct as

recently as *Commonwealth v. Novak,* 395 Pa. 199, 210, 211, 150 A. 2d 102 (1959) and as early as *Commonwealth v. Mosler,* 4 Pa. 264 (1846). See also *Matchin v. Matchin,* supra, 6 Pa. 332, 337 (1847), where the court refers to nymphomania as no defense of adultery.

Care must be taken not to confuse the mental or physical ill-health which we have held to be a defense to indignities, with the insanity which has been held in other states, and which we here hold to be a defense to adultery. A wife's neglect of her home and her husband have been listed among indignities recognized in Pennsylvania, but if she fails to cook her husband's meals, and wash his clothes and clean his house, and if she neglects him generally because she is physically or mentally unable to do otherwise, of course, the neglect does not constitute an indignity. Furthermore, a person because of a physical or a mental condition may be irritable and may spontaneously say and do mean and contemptible things. If this conduct is *caused* by the physical or mental condition of a wife-defendant in a divorce action, she is excused from them *on the theory that such conduct lacks the spirit of hate, estrangement and malevolence which is the heart of the charge of indignities. Schulze v. Schulze,* 33 Pa. Superior Ct. 325, 330 (1907) ; *Stewart v. Stewart,* 171 Pa. Superior Ct. 218, 221, 90 A. 2d 402 (1952) ; *Moyer v. Moyer,* 181 Pa. Superior Ct. 400, 413, 124 A. 2d 632 (1956) ; *Carle v. Carle,* 192 Pa. Superior Ct. 490, 162 A. 2d 38 (1960).

Insanity such as here claimed is an affirmative defense, and it would have to affirmatively appear that the defendant did not know the nature and consequences of her adultery before she can be relieved from responsibility for her conduct. 27A C.J.S., Divorce, §123(4).

Was the defendant here suffering from the degree of insanity which would be a defense to her adultery? Even assuming that all the testimony of the psychiatrists was admissible, there is insufficient evidence from which to find that she was insane when she committed adultery in 1958. The medical testimony related to 1955. Thereafter she was discharged from the hospital and continued to operate her home and rear her children.

The evidence leaves no doubt that the defendant in this case knew the nature and consequences of her illicit relationship with the co-defendant. The evidence does not support a conclusion that a mental illness took from her the freedom of moral action. See *Commonwealth v. Mosler*, supra, 4 Pa. 264, 267 (1846). We might note that if she did not know the nature and consequences of her acts, she was dangerous to herself and society and should have been confined in an institution. If the counsel (she had many) who called the psychiatrists thought she was of unsound mind, it was his duty to call this belief to the attention of the Court, and ask for the appointment of a guardian, and if the master or the court thought she was of unsound mind, a guardian should have been appointed. See Pa. R. C. P. 2056(c) (d). The record here shows that while this case was being heard, the defendant was contending in another court that she was a proper person to have custody of the children, and her counsel was calling upon her to testify and was conducting on her behalf the custody case, a support case and this divorce case without a guardian. It is true that her life was filled with contemptible and emotional, perhaps at times even hysterical, conduct directed towards her husband at least some of which may have been caused by a mental illness. However, from our examination of the evidence, we find nothing from which we could con-

clude that when she was committing adultery in 1958, she was not fully conscious of the nature and consequences of her acts, or was deprived of her freedom of moral action, or did not have the ability to distinguish between right and wrong.

Decree affirmed.

---

DISSENTING OPINION BY MONTGOMERY, J.:

I readily concur in that part of the opinion of the majority of this Court holding that insanity is a good defense to an action for divorce brought against a wife on the ground of adultery if it affirmatively appears from all of the evidence that at the time the act was committed she did not know the nature and consequences of same or have the ability to distinguish between right and wrong. However, I respectfully differ from the majority in recognizing the case of *Matchin v. Matchin*, 6 Pa. 332, as authority for a contrary ruling, viz., that insanity on the part of a wife is not a recognized defense in a divorce action against her brought on the charge of adultery.

Although the subject of nymphomania and erotomania was discussed in the *Matchin* case, the issue of the wife's insanity was not raised. The divorce in that case was granted upon depositions submitted by the complaining husband, which make no mention of the wife's mental condition; and it is specifically stated on page 335, "The appellant gave no evidence, . . ." The only issue before the appellate court was that relating to the sufficiency and legality of the evidence, viz., whether the wife's alleged confession of adultery was or was not supported by facts or circumstances to the extent that it constituted sufficient evidence for the granting of the divorce. The defense of insanity was not raised, and why it was even discussed by Chief Justice GIBSON does not appear in the report of the

case. The wording of the opinion in itself shows that the discussion of insanity was not justified as an issue under the evidence in the case (p. 336) : "Though we are bound to determine this appeal on the depositions sent up with the record, they contain enough to warrant a *concurrence* in the *general belief* that the appellant was actually insane; for no woman in her senses, however lost to shame, would apprize her husband's kinswoman, by whom her confidence was certain to be betrayed, of an assignation with a paramour." (Emphasis added) Is general belief or a concurrence in same sufficient to establish a basis for such an important ruling? I think it is not. The *Matchin* case has been crticized many times,[1] as indicated in the majority opinion in this case, and I think rightfully so if it has been held out as authority for the principle just discussed.

However, it is interesting to note that what Chief Justice GIBSON considered as concurring evidence of insanity in the *Matchin* case (the wife's confession to a relative of her husband) is not regarded as indicative of any mental disorder in the present case, wherein the wife proclaimed publicly about her feelings toward her alleged paramour.

I am also in accord with the majority in holding that some mental disorders, although not sufficient to constitute a defense to the charge of adultery in divorce actions, may nevertheless be sufficient against a charge of indignities to the person or even cruel and barbarous treatment.

However, I am *not* in accord with the final decision of the majority in affirming the decree of the lower court in granting a divorce to the husband. The facts

---

[1] 1 Freedman, Law of Marriage and Divorce in Pennsylvania §210 (2d ed. 1957).

are well established that the appellant had mental and emotional difficulties which became progressively worse, compelling her confinement in the Embreeville State Hospital for approximately four months and that she was discharged in the custody of her husband as having made a satisfactory adjustment; that the diagnosis of her condition was "sociopathic personal trait disturbance, anti-social reaction," and "schizophrenic reaction, paranoid type." Dr. Ivins, a psychiatrist, testified that, with her type of condition, she could probably not be cured within a period of three or four months without further treatment. She received no additional treatment after she was discharged into the custody of her husband. Dr. Ivins testified further that generally speaking a schizophrenic paranoid type does not know the difference between right and wrong.

Under the circumstances just stated, the appellee, into whose hands the appellant had been released, instituted divorce proceedings against her within the one-year period. She was discharged into his custody as of May 30, 1955, for one year, this divorce action was entered in the Common Pleas Court of Delaware County at the 1956 June Term of court, and at no time was any effort made to comply with Pa. R. C. P. 2051 et seq., requiring the appointment of a guardian in litigation involving a habitual drunkard, a weak-minded person, or a person of unsound mind.

There can be little question about the appellant's mental condition during this period of litigation. The majority opinion recognizes that she hired and fired numerous lawyers, that she was litigous, conducting or trying to conduct several different lawsuits simultaneously, and, as the majority opinion expressed it, ". . . her life was filled with contemptible and emotional, perhaps at times even hysterical conduct directed towards her husband, at least some of which may have

been caused by mental illness." The lower court also was aware of her mental condition since it sustained her defense of mental illness against the charge of indignities to the person of her husband.

If this decree in divorce is permitted to stand, it would seem to me that the law has failed in its obligation to protect those who are not able adequately to protect themselves. This Court has said before that courts are under a duty to see that an incompetent is adequately represented in fact as well as in theory. *Schwarzkopf v. Schwarzkopf*, 176 Pa. Superior Ct. 441, 449, 107 A. 2d 610.

I would, therefore, sustain this appeal, reverse the lower court awarding a decree of divorce, grant a new trial,[2] and direct that a guardian be appointed to protect appellant and her rights in the proceedings that would thereafter follow.

Consequently, I dissent.

---

[2] "(d) If, at any time after the conclusion of the trial, or after the entry of a finding, verdict or judgment against a party from whom relief is sought, the court shall find that such party was incompetent at the time of the entry of such finding, verdict or judgment and was not represented in the action by a guardian or a guardian ad litem, the court may vacate the finding, verdict or judgment and may enter an order in the nature of a procedendo." Pa. R. C. P. 2056(d).