McAnulty *v.* McAnulty, Appellant.

Submitted November 13, 1961. Before Rhodes, P. J., Ervin, Wright, Woodside, Watkins, Montgomery, and Flood, JJ.

*Donald Laird Hankey,* for appellant.

*Irving M. Green* and *William F. Nee,* for appellee.

OPINION BY RHODES, P. J., December 14, 1961:

Plaintiff-husband filed a complaint in the Court of Common Pleas of Westmoreland County on September 2, 1959, seeking a divorce a.v.m. from defendant on the ground of indignities. The case was referred to a master who, after a lengthy hearing, filed a report recommending a decree for the cause alleged in the complaint. Defendant's exceptions to the master's report were dismissed by the court below and a decree entered in plaintiff's favor. Defendant appealed.

We are required on appeal to review the evidence in detail and reach an independent conclusion in order to determine whether in truth a legal cause for divorce has been established. *McElroy v. McElroy,* 185 Pa. Superior Ct. 78, 81, 138 A. 2d 299. The report of the master who saw and heard the parties is entitled to the fullest consideration, especially where the evidence is in conflict and credibility is a crucial factor. *Davidson v. Davidson,* 191 Pa. Superior Ct. 305, 311, 156 A. 2d 549; *Manley v. Manley,* 193 Pa. Superior Ct. 252, 254, 164 A. 2d 113.

The parties were married on December 1, 1949; no children were born of the marriage. Following the marriage the parties lived in separate adjoining homes on Rebecca Street in New Kensington, Westmoreland County. An apparent factor in this arrangement was defendant's wish to continue employment with the Aluminum Company of America, where married women were not employed. However, from July, 1955, until November, 1956, plaintiff lived with his wife at her home. While living together, plaintiff stated that after the first four months defendant engaged in frequent arguments with plaintiff in the course of which she called him vile names and struck him with various objects, including a knife, fork, pocket book, her fists, and hands. Her abusive conduct continued often in the presence of others. In January, 1957, defendant called

plaintiff on the telephone and asked him to come over to get his Christmas present. Plaintiff emerged from this visit with his face badly scratched  This fact was corroborated by plaintiff's sister who heard defendant refer to plaintiff, once injured in the mine, as "that crippled son-of-a-bitch." A service station owner and his employe both testified they saw the parties in a car near the station; defendant was scratching and striking plaintiff, who tried in vain to protect himself. On another occasion, in the fall of 1958, a service station operator witnessed an attack by defendant upon plaintiff at the station wherein defendant attempted to strike plaintiff with a tire hammer while yelling and shouting and calling plaintiff insulting names. The superintendent of a cemetery where plaintiff was employed, in June of 1960, testified to an incident in which defendant came to the cemetery and engaged in violent conduct and abusive language toward plaintiff to the annoyance of passers-by and the embarrassment of the witness and his sixteen-year-old son. As a result of such course of conduct on the part of his wife, plaintiff's health was adversely affected, he lost weight, and he had difficulty continuing his employment as a coal miner. In April, 1957, defendant had plaintiff arrested for nonsupport.

Testifying at length on her own behalf, defendant stated that plaintiff lived next door to defendant, with his mother, from the time of their marriage until 1955; that he spent much time at her place. She prepared his meals and had marital relations with him. Defendant accused plaintiff of being niggardly in his support, and stated plaintiff frequently had fits of temper and used vile language. Defendant denied scratching plaintiff on the occasion at the service station referred to by plaintiff's witness. However, she impliedly admitted threatening plaintiff with physical violence at the service station when she stated, on cross-examination, that

the object used was a "pipe" not a tire hammer. Indeed, many of defendant's denials were so qualified as to amount to admissions of plaintiff's charges. Though numerically defendant produced a few more witnesses than plaintiff, like the master, we are not impressed with the quality of much of defendant's evidence. The master reviewed the evidence produced at the hearing and noted that plaintiff's evidence was of better quality and more credible than that produced by defendant and her witnesses.

Whether a course of conduct amounts in law to indignities depends upon all the circumstances of a particular case, including the position in life, character, and disposition of the parties. *Boyer v. Boyer,* 183 Pa. Superior Ct. 260, 270, 130 A. 2d 265. Indignities may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement. *Schware v. Schware,* 192 Pa. Superior Ct. 166, 168, 159 A. 2d 568; *Kramer v. Kramer,* 194 Pa. Superior Ct. 538, 542, 168 A. 2d 624.

From a review of the evidence, we are of the opinion that plaintiff, as the injured and innocent spouse, established such a course of conduct on the part of defendant as amounted in law to indignities entitling plaintiff to a decree on that ground.

Decree is affirmed.